THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OZZIE WALLACE, Defendant-Appellant.

First District (5th Division) No. 1—87—3698

Opinion filed February 22, 1991.

Randolph N. Stone, Public Defender, of Chicago (Alison Edwards and Stephen J. Watson, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Bonnie Meyer Sloan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COCCIA delivered the opinion of the court:

Defendant, Ozzie Wallace, was charged by indictment with armed robbery. (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a).) Following a joint bench trial with codefendant Dwayne King, he was found guilty and sentenced to six years' imprisonment. Codefendant King was acquitted. On appeal, Wallace contends that (1) the trial court erred in permitting the indictment to be amended on the second day of trial; (2) the trial judge should have stricken the in-court identification of him

by an occurrence witness because the identification procedure used was unreasonably suggestive; (3) the trial court erred in convicting him on the basis of hearsay and assumptions not supported by the evidence; and (4) the testimony of the State's witnesses was insufficient to prove him guilty beyond a reasonable doubt. Defendant maintains that the indictment against him did not allege the correct robbery victim and should therefore be dismissed. Alternatively, defendant requests reversal of his conviction because there was insufficient evidence to establish his guilt, or reversal and remandment to the circuit court for a new trial. For reasons which follow, we affirm.

The crime in question took place on the night of November 9, 1985, in a Jewel Tea Company (Jewel) food store located at 9142 South Chicago Avenue, Chicago, Illinois. At trial, the State presented the testimony of three Jewel employees and a Chicago police officer. Another police officer testified for the defense. The codefendant did not testify.

Elodie McDaniel, a Jewel employee, testified that on the night of November 9, 1985, she was performing her usual duties behind the customer service desk with two co-workers. The store had just closed. Suddenly, McDaniel felt someone bump her. Turning in that direction, she saw a man who she knew did not belong behind the service counter, and she screamed. She further testified that she was able to see the man's face, and that he was carrying a "regular size" gun. McDaniel heard the man say, "Just give me the money." She "immediately" turned in the opposite direction, away from the man. At this point in McDaniel's testimony, she was asked to make an in-court identification of the individual who bumped her behind the Jewel service counter. The following colloquy occurred:

"Q. [Assistant State's Attorney]: Now, Miss McDaniel, how tall a lady are you?

A. I'm about five, six and a half.

Q. The individual that you saw behind the service counter, was he your height, taller, or shorter?

A. He was shorter than I am.

MR. BOYLE [Assistant State's Attorney]: Judge, at this point I would ask the defendant to stand. The purpose being, Judge, so that there [sic] height can be easily ascertained, rather than from a sitting position.

MR. HOWSE [Defendant King's attorney]: I would object, Judge.

MR. O'HARA: [Defendant Wallace's attorney]: Objection, your Honor. There's been no in-court identification made by this lady.

\* \* \*

THE COURT: I don't think that the request is out of order. I will have the defendant stand—both defendants.

MR. BOYLE: Judge, could they come closer together?

THE COURT: I think that you can determine it from there.

Q. [Mr. Boyle]: Miss McDaniel, the individual that you saw behind that Service Counter when you felt the bumping, and turned in that direction, do you see him in court today?

A. Yes, sir.

Q. Will you please point to him?

A. The one with the blue suit on.

MR. BOYLE: Judge, may the record reflect the in-court identification of the defendant, Mr. Wallace.

THE COURT: You may sit down."

McDaniel further testified that when the man behind the counter demanded money, her co-worker, Cynthia Pujdak, put the money in "a bag or sack." She explained that while the money was being demanded, she "couldn't definitely see," but "could get a vision of" a "tall person," who ordered the rest of the night crew in the store to "remain on the floor." Although McDaniel stated that she could see the tall man in the courtroom, King's attorney objected to her identification of his client. The trial judge sustained the objection, stating that McDaniel's opportunity to observe was so limited, by her own admission, that her in-court identification was essentially worthless. Defendant Wallace's attorney then made a similar objection to McDaniel's in-court identification of Wallace. He noted that the witness had not identified Wallace prior to the time when the two defendants stood up, and suggested that the only reason that she identified him was because he was six inches shorter than King. The court ruled that while such considerations affected the weight to be given to her identification, it was nonetheless admissible.

On cross-examination, McDaniel testified that the service counter had been closed to customers for at least an hour before the robbery occurred. At the time that the shorter robber jumped over the desk and bumped her, she and Cynthia Pujdak, who was standing to her left, were counting the money in the cash register tills. Kim Merk, the third service counter clerk, was heading toward the door, on her way out of the enclosed area. Although McDaniel admitted that she did "not exactly see" the defendant jump over the service counter,

she "could feel the jump," because "the person who came to [her] was jumping." She further stated that when he bumped her, the man was standing between her and Pujdak, close enough to both so that the three of them "could practically hug." She testified that, after the man demanded money, he told her not to look at him, and she complied by not turning back in his direction after she turned away. Then, as Pujdak placed the money in the bag, the man ordered, "Everybody down on the floor." McDaniel stated that she immediately crouched down and did not look up at the man again. She reiterated, however, that she had already looked at the man before he said anything. While McDaniel agreed with defense counsel that she had looked at the man for only "a second or two" after he jumped over the counter, and then had turned away, she also testified that she had seen the same man in the store earlier that night, just prior to closing time. She stated that he was wearing a hat, with a brim, that was pulled down across his eyebrow, and what appeared to be a "suit jacket." When asked about her statement to police that this man was approximately 40 years old, McDaniel explained that he had looked older on the night of the robbery than he did in the courtroom because on that night he had "dressed older." On redirect examination, McDaniel described the lighting at the service desk as "very good" overhead lighting, and stated that people could see very well at the desk.

Before calling its next witness, the State moved to amend the wording of the indictment charging the codefendants with the crime. The indictment charged Ozzie Wallace and Dwayne King with armed robbery "in that they, by use of force and by threatening the imminent use of force while armed with a dangerous weapon, took United States currency from the person and presence of Lorraine Zima." The State requested leave of court to strike Lorraine Zima's name and insert in its place the names of Elodie McDaniel, Cynthia Pujdak, and Kim Merk. Defense counsel objected to the amendment. They argued that the trial had already begun, that jeopardy had attached, and that the proposed amendment was not merely a cosmetic alteration of the document, but a substantive change, in that it changed the name of the robbery victim. The prosecutor pointed out that a bill of particulars had been requested and provided, and that it alleged a certain date, time, and location of the crime. In addition, all four of the employees' names appeared on the same page of the grand jury transcript, as well as in the police reports. He further observed that these documents had been in defense counsel's possession for over 18 months, during which pretrial motions had been extensively argued. He therefore maintained that the defendants would be neither sur-

prised nor prejudiced by the substitution of names to remedy a technical defect in the indictment. Finally, he stated that he was amenable to defense counsel taking additional preparation time, if needed. The trial court, after hearing arguments and examining the grand jury transcript and relevant case law, ruled that the amendment was formal rather than substantive in nature, would not prejudice the defendants, and would therefore be allowed.

Lorraine Zima testified that on the night of November 9, 1985, she was working alone in the "Deli Department" of the Jewel food store in question. The deli counter had been closed to customers at 8 p.m., but it was her responsibility to stay and clean up the department. At approximately 8:30 p.m., two young men approached the deli counter and asked for service. Zima told them that the department was closed, but that she would wait on them if they hurried. She further recalled that one of the men, "standing to [her] right," decided on his order, while the other individual walked back and forth in front of the counter and could not make up his mind. Zima also testified that the deli counter area had "very bright" fluorescent lighting, and that the two men were standing less than three feet from her during the four to five minutes that she waited on them. She stated that she was facing them during this time and repeatedly telling them to hurry, because she wanted to close the department. Zima was then asked to "look around the courtroom" and to state whether she saw the two men who had come to the deli counter. She identified Wallace and King as those men. Following her identification of the defendants, Zima clarified that, while she waited on the two customers at the deli counter, the "taller one," who quickly decided on his order, was standing to her right, while the "short one" was walking back and forth in front of the cage. She also stated that a police officer came to the store on the day following the robbery and showed her a book of photographs, from which she picked out photos of both men.

On cross-examination, Zima explained that although she selected two photographs from the police book on the day after the robbery, she told the officer that she was "not really sure" about one of them, because that person had been "standing to the side" of her at the deli counter. She further testified that she told the police that the two men were "roughly" in their early 30's, and that the shorter man was wearing a "beige-rust" jacket and a "rusty-beige hat." She also recalled that she gave the men one half-pound of turkey and one-half pound of corned beef. She stated that after the two men left her department, she did not see them again that night. On redirect examina-

tion, Zima testified that the two men left her department together. She stated on re-cross-examination that Wallace looked the same in court as he had in the police photograph, except that he appeared to have lost a little weight and his hair was shorter. When asked whether she had told the police that the shorter man at the deli counter was clean shaven, she responded affirmatively.

Kim Merk was the State's next witness. She testified that on the night in question, she was working behind the customer service counter with Elodie McDaniel and Cynthia Pujdak. At approximately 9 p.m., a man "came flying over the counter." Merk stated that the man who jumped over the counter was holding a small gun in his hand. The man announced, "This is a holdup; this is a robbery, let me have your money." Merk also noticed another man at this time. He was standing farther away from the service desk and was also holding a gun. The witness further testified that after Pujdak had handed all the money to the robber, the robber instructed the service counter employees to leave the area through a side door and to go upstairs, which they did. At this point in her testimony, Merk was asked to "look around the courtroom" and to state whether she saw the man who jumped over the counter. She then identified Wallace as that man. She also identified King as the man who stood outside of the desk area, holding a gun. Finally, Merk described the Jewel service desk area as "very well" lighted, with "tube lights."

On cross-examination by Wallace's attorney, Merk testified that after the robber jumped over the counter, he told the service desk employees to "get down," and that they complied by crouching down on their knees. She further stated that she was able to observe the man behind the counter for about 15 seconds before he said, "Don't look at me," and she turned away. She recalled that he was wearing a "cap" which was "gray or tan something like a duller color," and which "came down by his eyes." Merk further testified that she spoke with police officers immediately after the robbery. Although she was unable to estimate the robber's age, height or weight for the police, or identify any distinctive facial marks, she was certain that he was shorter than she was. Merk acknowledged that Wallace, as he sat in the courtroom, appeared to have a scar on his temple, but she noted that his cap was covering his temple during the robbery and that she would not have been able to see the scar.

On cross-examination by King's attorney, Merk stated that, before she crouched down as instructed, she had observed another man standing about 25 feet away from the service counter. She admitted that she could not see his face as well as she could see the other

man's, and that she told the police that she could not identify the second man. She could tell them only that he was taller than the man behind the counter and that he was wearing a ski mask and a jacket.

Chicago police detective William Marley testified that about 9 p.m. on November 9, 1985, he and his partner, Detective James Pienta, responded to a radio call reporting a robbery in progress at the Jewel store at 93rd Street and South Chicago Avenue. The radio report described a wanted vehicle. Marley stated that he and Pienta were involved in a chase of the vehicle, which was eventually found abandoned at 85th Place and Stony Island Avenue. He described the vehicle found at that location as a gray-over-gray Vega. Detective Marley was then asked to identify certain items, marked as State's exhibits, which had been taken from the abandoned car and inventoried by the police. These included a vehicle identification card containing the name "Ozzie Wallace, Junior"; three traffic citations issued in the 1500 block of West 51st Street, an area which Marley stated was about eight miles from the location where the car was found and where police later learned that Wallace resided; and an address book containing the name "Ozzie Wallace, Jr." The items were received into evidence without objection.

Detective Marley testified on cross-examination that he sighted the wanted vehicle only once during the police chase. The car was crossing an intersection about a block from his car, affording him a side view of the vehicle. Marley further testified that the sighting occurred within five minutes of the original police broadcast, near the intersection of 92nd Street and Colfax. He recalled that there was one police car between his car and the wanted vehicle at that time, and estimated that he was traveling at 40 miles per hour, while the pursued vehicle crossed the intersection at a speed of between 35 and 45 miles per hour. He stated that the wanted vehicle was eventually found by other police officers at approximately 10 p.m. that night. Marley also testified that he returned to the Jewel store with Detective Pienta sometime on November 10, 1985, but was not present in the store office when Pienta displayed photographs to Lorraine Zima.

Detective James Pienta testified for the defense. He stated that on November 9, 1985, he was assigned to investigate the robbery in question. He recalled conducting interviews with Jewel employees on the night of the robbery and returning to the store at approximately 11 a.m. the next day. Pienta further testified that he displayed 14 photographs to Zima at that time. He then identified the group of photographs, which were marked as a defendants' exhibit and admitted into evidence, and stated that there were no photos of Dwayne

King in the group. The detective further stated that during his interview with her, Zima provided a description of the "shorter man" at the deli counter. As reflected in his notes, Zima described this individual as clean shaven, with a medium brown complexion, and wearing a "beige, waistlength jacket, dark hat, [and] light colored shirt."

On cross-examination, Pienta testified that he had occasion to see Wallace on November 10, 1985, at 8 p.m., and that Wallace was clean shaven at that time. On redirect examination, he also stated that Wallace's hair had then been longer and slicked back, while at trial his hair was worn in a "short naturel [sic]" style.

By agreement of the parties, it was stipulated that if Chicago police officer Overstreet, star 17077, were to testify, he would testify that on November 9, 1985, he was called to the Jewel store in question to investigate a robbery and that he interviewed Cynthia Pujdak, Elodie McDaniel and Kim Merk at that time. It was further stipulated that Officer Overstreet would testify that he recorded, based on these interviews, the following composite description of one of the robbers: "gray cap, light blue blazer, dark pants, male black, forty years of age, height of five foot five, eyes brown, hair dark, complexion dark." It was also stipulated that if Detective Marley were to testify, he would testify that during an interview at the Jewel food store, Lorraine Zima told him that between 8:30 p.m. and 8:45 p.m. on November 9, 1985, she was working behind the deli counter when approached by two men.

After hearing closing arguments, the trial judge acquitted King, citing unclear and insufficient identification testimony. However, he found that the identifications of Wallace were positive and much clearer, and that together with the evidence found in the abandoned vehicle, were sufficient to establish his guilt beyond a reasonable doubt.

OPINION

■ Defendant first contends that the trial judge erred in allowing the State to amend the armed robbery indictment, on the second day of trial, to change the name of the robbery victims. An indictment may be amended on motion by the State's Attorney or defendant at any time because of formal defects, including a miswriting. (Ill. Rev. Stat. 1985, ch. 38, par. 111–5; *People v. Glover-El* (1981), 102 Ill. App. 3d 535, 542, 430 N.E.2d 147.) The crucial question is whether, under the facts of this case, striking the name of Lorraine Zima, the deli counter employee, and substituting the names of the three cus-

tomer service counter employees constituted a substantive or a formal change in the indictment.

In *People v. Jones* (1973), 53 Ill. 2d 460, 292 N.E.2d 361, our supreme court was faced with the same question under similar facts. A grand jury had returned an indictment charging Jones with taking "United States currency from the person and presence of Charles Mundy, by threatening the imminent use of force." (*Jones*, 53 Ill. 2d at 462, 292 N.E.2d at 362.) On the morning of the trial, and over the defendant's objection, the prosecutor was allowed to amend the indictment, changing the alleged victim from "Charles Mundy" to "Delbert R. Mundy." The Appellate Court, Fourth District, reversed Jones' conviction on grounds that the record showed that Charles Mundy was Delbert R. Mundy's adult son, an entirely different person, and therefore the amendment did not merely correct a misspelling, but actually changed the victim's identity and should not have been allowed. (*People v. Jones* (1972), 4 Ill. App. 3d 870, 282 N.E.2d 23.) As noted in Justice Smith's dissent to the appellate decision, the indictment charged Jones with the offense of armed robbery at a particular address, which the record revealed was a business establishment operated by Delbert R. Mundy. The record also established that Delbert was included as a witness on the list of witnesses furnished to defendant prior to trial. (*People v. Jones*, 4 Ill. App. 3d at 873, 282 N.E.2d at 25 (Smith, J., dissenting).) The supreme court reversed the appellate court decision and reinstated Jones' conviction. The court held that, although the identity of an armed robbery victim is an essential allegation of an indictment charging the offense, that fact is not dispositive of the issue of whether a misstatement of the victim's identity is a formal or substantive defect in the indictment. (*Jones*, 53 Ill. 2d at 464-65, 292 N.E.2d at 363.) The court went on to state:

> "Th[e] trend away from the formalism which characterized criminal pleading in the past is embodied in our section 111—5, as disclosed by the chief draftsman's commentary: 'The committee felt that the practical limitations should overcome the conceptual ones and provided for the efficient amendment of formal defects.' S.H.A., ch. 38, par. 111—5, Committee Comments, p. 444 (1963).
>
> The liberalization of criminal pleading also reflects a lessening in importance of the indictment's secondary functions. The indictment as a means of informing defendants of particulars concerning the case is now far overshadowed by the array of discovery procedures available to the defense. Similarly, the time when an indictment defined the limits of jeopardy has

passed and a prior prosecution on the same facts may be proved by resort to the record. [Citation.] The primary safeguard of indictment by grand jury, which remains secured to criminal defendants, is to protect individuals from the caprice of the public prosecutor. ***

We believe that this constitutionally required protection has been afforded this defendant and that the particular facts in this case demonstrate the amendment of the victim's first name to be a mere formality. Where, as here, no hint of surprise or prejudice to the defendant is shown, allowance of such an amendment is not error." *Jones*, 53 Ill. 2d at 464-65, 292 N.E.2d at 363.

■ The reasoning of *Jones* applies with equal force to the case at bar. Here, the indictment was amended to reflect the name of the persons in the Jewel store from whom the money was actually taken. However, the amendment did not change or broaden the scope of the offense charged. (Compare *People v. Betts* (1979), 78 Ill. App. 3d 200, 397 N.E.2d 106 (where the grand jury clearly intended to charge an offense involving a narcotic drug, and the State's amendment to the indictment, deleting the reference to narcotics and in effect charging a violation of a different statutory provision, was deemed to be a substantive and impermissible amendment).) Furthermore, no surprise or prejudice to defendant Wallace was shown or even alleged. The State furnished defendant with a bill of particulars (Ill. Rev. Stat. 1985, ch. 38, par. 111—6), and the grand jury heard testimony relating to all four employees and the robbery of a certain store at a specific time. Extensive discovery was completed and pretrial motions relating to defendant's arrest were argued in the 23-month period between the crime and the trial. Thus, defendant was well advised of the nature and particulars of the charges against him and was in no way hindered in the preparation of his defense. In fact, although the State was willing to afford the defense additional preparation time, the defense attorneys requested none, and the trial proceeded as scheduled. Finally, we may be confident that the amendment did not expose Wallace to the danger of a second trial on the same charges. In a bench trial, jeopardy attaches when the first witness is sworn and the court begins to hear evidence. (*People v. Laws* (1963), 29 Ill. 2d 221, 224, 193 N.E.2d 806; *People v. Foley* (1987), 162 Ill. App. 3d 282, 287, 515 N.E.2d 351.) However, the defendant may have recourse to the record in this case as a bar against any future prosecution for the same offense. (See *People v. Jones*, 53 Ill. 2d at 464, 292 N.E.2d at 363; *People v. Montgomery* (1981), 96 Ill. App. 3d 994, 998, 422

N.E.2d 226; *People v. Cassman* (1975), 32 Ill. App. 3d 456, 458, 336 N.E.2d 85.) It is evident that the trial transcript and other documents of record would provide adequate protection against double jeopardy. For all of the above reasons, we hold that the amendment corrected a misnomer, which was a formal defect in the indictment, without prejudice to defendant, and was therefore properly allowed.

■ Defendant next contends that the in-court identification testimony of Elodie McDaniel was the result of an impermissibly suggestive procedure, amounting to a "show-up," and that her identification of him as the robber should have been excluded from evidence. He maintains that the procedure used constituted a denial of his constitutional right of due process. (U.S. Const., amend. XIV.) As defendant correctly notes, the United States Court of Appeals, Seventh Circuit, has indicated, in a case not involving such facts, that an in-court identification procedure whereby a criminal defendant stands out physically from others in the courtroom at the time he is identified by the witness might be impermissibly suggestive. *United States v. Bush* (7th Cir. 1984), 749 F.2d 1227.

■■ ■ In addition, the United States Supreme Court has clearly defined the principles and the approach to be used by courts in determining whether an allegedly suggestive identification violated the standard of fairness required by the due process clause. In determining the admissibility of identification testimony, "reliability is the linchpin." (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253.) Whether the witness' identification of the defendant is reliable, despite the suggestiveness of the identification procedure, is to be determined by examining the totality of the facts and circumstances, including: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. (*Manson*, 432 U.S. at 114, 53 L. Ed. 2d at 154, 97 S. Ct. at 2253; *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313, 1317.) These factors are to be weighed against the corrupting effect of the suggestive identification itself, in order to determine whether the identification was reliable under the totality of the circumstances. *Manson*, 432 U.S. at 114, 53 L. Ed. 2d at 154, 97 S. Ct. at 2253; *Manion*, 67 Ill. 2d at 578, 367 N.E.2d at 1317.

We begin with the witness' opportunity to observe the accused at the time of the crime. McDaniel testified that, at the moment the robber bumped her, surprising her so that she turned directly toward

him, she was in a very well-lighted area at a Jewel customer service counter. The robber jumped over the counter, landing between McDaniel and a fellow employee, so close to both women that the three individuals "could practically hug." Although McDaniel testified that she was startled, and that she screamed when she turned toward the robber, she stated that she was able to see his face and observe his gun. She admitted that she saw his face for only "a second or two," turned immediately away from him, and complied with his instructions not to look at him again. However, she further testified that she had also seen him earlier that same evening in the store, just prior to closing time. She thus had a good opportunity to observe him behind the counter at very close range, even if only for a few seconds, and another opportunity to view him in the immediate area of the service desk, under nonthreatening circumstances, just prior to the robbery.

With respect to the degree of attention McDaniel would have focused on the robber under the circumstances, three elements of her testimony are significant. First, it is clear that she was startled, and recognizing that the robber was not someone who was allowed behind the counter, and seeing the gun, she immediately screamed and then turned away in fright. However, by her own direct testimony and from the very nature of her job responsibilities at Jewel, McDaniel would have been a more observant witness, both at a time of perceived threat or otherwise, than the average customer or casual bystander. Her duties involved receiving, counting, and safeguarding large sums of cash in a public place, after her department had been officially closed to customers for approximately an hour and immediately after the entire store had been closed to all but Jewel employees. Because she knew from experience which employees should have been approaching the service desk at closing time, she would be more likely to pay particular attention to other individuals observed in that area of the store. She specifically recalled seeing the defendant in that area before he actually jumped over the counter, in addition to viewing him at very close range for a few seconds of increased awareness and anxiety.

From memory, McDaniel gave the following description at trial of the robber who jumped behind the counter. She testified that he was shorter than 5 feet 6 inches in height, wearing a hat with a round brim, which was pulled down across his eyebrow, and what appeared to be a suit jacket. She admitted that she told the police, at the time of the incident, that the man was approximately 40 years old, explaining that he was "dressed older" on the night of the robbery than he appeared to be in court. She could not remember if she told the police

that he was wearing a gray cap, but she was certain at trial that it was a hat, rather than a cap. Documents of record indicate that the defendant was almost 27 years old at the time of the robbery. The record further indicates that he was approximately six inches shorter than codefendant King. After interviewing McDaniel, Merk, and Pujdak on the night of the robbery, Officer Overstreet produced a composite description of the man behind the counter as a black male, approximately 40 years of age and 5 feet 5 inches tall, with a dark complexion, wearing a gray cap and a light blue "blazer." Lorraine Zima told the police that both men were "roughly" in their early 30's and that the shorter of the men was wearing a beige-rust "jacket" and a rusty-beige "hat." Although Merk testified at trial that she was unable to estimate the man's age, height, or weight, and described his head apparel as a "cap," she specifically stated that the cap was a dull color, such as gray or tan.

■■ While there are some obvious discrepancies in the descriptions of the several witnesses, and while McDaniel did not testify that she observed or described to police distinctive facial features of the defendant, it is nowhere claimed that Wallace did not possess the physical characteristics which McDaniel was able to recall or describe to police. Her incorrect estimate of his age is explainable by his clothing, including the hat or cap pulled down to his eyebrow, and his blazer or jacket. Moreover, her description is not so inconsistent with that of Zima, or with the composite description taken from interviews with the three service counter employees, or with the actual characteristics of defendant, that a reasonable doubt is cast upon the accuracy of her in-court identification by virtue of a comparison with her initial description or with the description of other witnesses. While the accuracy of her in-court identification may be substantially a matter of credibility, to be judged by the trier of fact, its reliability is not undermined by a comparison with her prior description of the defendant.

The fourth factor to be considered in determining reliability is the witness' level of certainty. As evidenced by the portion of the trial transcript quoted above, McDaniel did not hesitate in identifying Wallace as the robber who landed next to her behind the service counter. Nor did she equivocate or express any uncertainty about her identification during cross-examination, when she was questioned at length about her opportunity to observe defendant at the time of the robbery and about why she had initially misjudged his age.

The final factor to be considered is the time between the crime and the confrontation. In the case at bar, the time between the rob-

bery, which occurred on November 9, 1985, and the witness' in-court identification of Wallace on October 5, 1987, was nearly two years. This is a substantial amount of time which would normally weigh against the witness' reliability.

 Our analysis of the five relevant factors leads us to conclude that McDaniel's in-court identification of defendant Wallace was supported by sufficient indicia of reliability, including adequate opportunity to observe, and that despite the suggestive procedure used, it was properly admitted into evidence. The weight to be given to that identification was then for the trier of fact to determine, as the trial judge noted. Furthermore, this court has emphasized the important role that cross-examination plays in protecting a defendant's due process rights during trial. In another case involving a suggestive in-court identification, we stated:

> "In our view, suggestiveness at trial, absent the taint of extrajudicial suggestiveness, does not offend due process because the trial itself affords the defendant adequate protection. *** We stress cross-examination, 'the greatest legal engine ever invented for the discovery of truth.' [Citation.] Where a witness first identifies the defendant at trial, defense counsel may test the perceptions, memory and bias of the witness, contemporaneously exposing weaknesses and adding perspective in order to lessen the hazards of undue weight or mistake." (*People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 589, 480 N.E.2d 1147.)

In the case at bar, the cross-examination of McDaniel by Wallace's attorney was competent and thorough, and was buttressed by the competent cross-examination of the same witness by King's attorney. For this reason as well, McDaniel's in-court identification, despite any suggestiveness, did not constitute a violation of due process.

 We would further observe that McDaniel's identification testimony, whatever its deficiencies or probative value, was not necessary to support a guilty finding under the facts of this case. While the State has the burden of proving beyond a reasonable doubt the identity of the person who committed the crime (*People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317), it is well established in Illinois that identification of the accused by a single eyewitness is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification to be made (*People v. Johnson* (1986), 114 Ill. 2d 170, 189, 499 N.E.2d 1355, 1363). An identification will not be deemed sufficient to support a conviction if it is vague or doubtful. (*Slim*, 127 Ill. 2d at 307, 537 N.E.2d at 319.) However, the credibility of an identification witness and the weight ac-

corded the witness' testimony is for the trier of fact to determine. (*People v. Godinez* (1989), 191 Ill. App. 3d 6, 547 N.E.2d 561.) In the case at bar, Kim Merk also testified as an eyewitness. She had an opportunity to view Wallace, at fairly close range, for about 15 seconds under bright fluorescent lights. At trial, she was asked to identify the defendant without suggestion or prompting. Her identification of Wallace was clear and unequivocal, notwithstanding her vague and doubtful identification testimony relating to King, which was ruled inadmissible. Therefore, if considered credible by the trier of fact, Merk's identification, without McDaniel's, would have been sufficient to sustain a conviction.

■■■ To summarize, we have determined that the suggestive procedure involved in McDaniel's identification of defendant was not a violation of due process, and that Merk's nonsuggestive and positive identification could stand alone as a sufficient identification by one eyewitness with adequate opportunity to observe, so that no prejudicial error occurred. Furthermore, we agree with the Supreme Court's observation in *Manson* that "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (*Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 53 L. Ed. 2d 140, 155, 97 S. Ct. 2243, 2254.) The same may be said of judges sitting as triers of fact. Nonetheless, we believe that the trial judge erred in employing the suggestive identification procedure used during McDaniel's testimony. Aside from any question of prejudicial effect, where a trial judge requests two codefendants to stand, before the witness has identified either of them as connected to the crime, the probative value of the witness' identification would be so seriously compromised, in most circumstances, as to substantially defeat its very purpose. Therefore, as a general rule, this procedure should be avoided in the conduct of criminal trials.

The defendant next contends that the trial court convicted him on the basis of hearsay and assumptions not supported by the evidence. Wallace maintains that the trial judge, having properly admitted Detective Marley's testimony about a police radio dispatch describing a wanted vehicle, and about finding an abandoned gray-over-gray Vega, for the limited purpose of explaining police conduct, improperly inferred from that testimony that the getaway car was his. As previously noted, Marley testified that he and his partner, traveling in a police vehicle, responded to a radio call reporting a robbery and describing a car wanted in connection with the crime. The wanted vehicle was then pursued by several police cars, was spotted by Marley as it crossed an intersection, and was later found abandoned at a loca-

tion about two miles from the crime scene, containing defendant's identification card and address book. No evidence whatsoever was presented as to the source of the radio report. No eyewitness testified that a vehicle matching the description of the car pursued and found by police was actually in the vicinity of the store at the time of the robbery. Defendant is therefore correct in stating that the probative value of the description rested upon the credibility of an unknown source who did not testify at trial, and was clearly hearsay. (See *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741.) The trial judge specifically referred to Detective Marley's testimony about the vehicle in explaining his guilty finding. The transcript contains the following colloquy:

"THE COURT: Now, as to Ozzie Wallace, the identifications were much more clear. And while there was some discrepancy in the description of the clothing, they were positive identifications, plus the fact that the police were given the type and model of the car, the type and model of the car that was involved in the robbery. They chased it and they found it abandoned, and in the car was the identification of Ozzie Wallace. So—

MR. O'HARA [Assistant Public Defender]: Your Honor, for the record, we did make an objection to that going into evidence as far as any description of the automobile, and Your Honor allowed that in for the restricted purpose of only stating why they did their actions and not for the substantive truth of the allegations in that message. I would once again reassert my objection to that evidence being considered as—

THE COURT: I'm conceding that point, but they found the automobile they were seeking and, in the automobile, was the identification of Ozzie Wallace. That, coupled with the identification, is sufficient to find Ozzie Wallace guilty beyond a reasonable doubt."

██ The hearsay rule prohibits the fact finder from considering testimony in court of a statement made out of court, where such statement is offered to show the truth of the matters asserted. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741.) However, where an out-of-court statement is offered not to prove the matter asserted, but rather to explain why the police investigation was conducted in the manner it was, the testimony is not hearsay. (*People v. Rivera* (1986), 145 Ill. App. 3d 609, 625, 495 N.E.2d 1088.) Here, Marley's testimony was not offered for the purpose of showing that the getaway car was in fact a gray-over-gray Vega, or that the

car found abandoned was in fact the getaway car, but to explain the course of conduct of the police on the night of the robbery. Defendant concedes that Marley's testimony was properly admitted for this limited purpose. However, he argues that the trial judge's statements, quoted above, show that the judge incorrectly assumed that because the police found the car that they were seeking, containing Wallace's identification, it reasonably followed that Wallace's car was the getaway car and that Wallace was thus linked to the robbery. Defendant points out that there was no substantive evidence in the record to support such a conclusion, and that, therefore, the judge must have improperly considered Marley's testimony about the radio report for the truth of the matter contained in that report.

In addressing defendant's argument, we first observe that it was entirely proper for the trial judge to find that there was probative value in the detective's testimony that police officers discovered an abandoned vehicle, containing defendant's identification card and address book, about two miles from the scene of the crime. With respect to the judge's comments about the police finding "the automobile they were seeking," which contained "the identification of Ozzie Wallace," and his conclusion that "that," coupled with the identification testimony of the witnesses, was sufficient to convict Wallace of the crime, it is not readily apparent that the judge must have assumed the truth of the radio dispatch. While this is one reasonable inference which could be drawn from the transcript, it is not the only one. As a court of review, we must presume that the trial court considered only competent evidence unless the contrary affirmatively appears of record. (*People v. Schmitt* (1989), 131 Ill. 2d 128, 138-39, 545 N.E.2d 665.) We therefore decline to hold as a matter of law that the trial judge erred in his consideration of the evidence. However, even if we assume, *arguendo*, that the trier of fact did improperly infer from Marley's testimony that the Vega found by police was in fact the getaway car, we believe that the error was harmless beyond a reasonable doubt. It is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless. (*Schmitt*, 131 Ill. 2d at 140, 545 N.E.2d at 670.) Here, the record includes properly admitted personal testimony of two eyewitnesses that defendant was the man who robbed the store in question. It includes the testimony of another credible witness who placed defendant in the store just prior to the robbery. It includes police testimony that an abandoned vehicle containing defendant's identification card was found about one hour after the robbery at a location about two miles from the store. The totality of the direct and circumstantial evidence prop-

erly considered by the judge in determining defendant's guilt was sufficient to support a conviction, without recourse to hearsay testimony to directly link defendant's vehicle to the crime. Thus, we must conclude that any error which occurred was harmless under the circumstances.

■■ ■ Having carefully reviewed the record, we must also disagree with defendant's final contention that the State's evidence did not establish, beyond a reasonable doubt, that he was the person who committed the robbery. A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) As we have noted, where the identification of the defendant forms the central question, the testimony of even one credible witness is sufficient to convict where the witness viewed the accused under conditions permitting a positive identification. Furthermore, the credibility of identification witnesses and the weight to be accorded their testimony is within the unique province of the trier of fact. *People v. Godinez* (1989), 191 Ill. App. 3d 6, 10, 547 N.E.2d 561.

■■ ■ The relevant question for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) In the instant case, the trier of fact was presented with Kim Merk's testimony identifying defendant as the robber. Her testimony may have been buttressed, to some extent, by McDaniel's identification and her statement placing defendant in the store within view of the service counter, just prior to 9 p.m. Lorraine Zima's unimpeached testimony was that defendant was in the deli department of the same store sometime between 8:30 p.m. and 8:45 p.m. on the night of the robbery, acting in a way which indicated an intention to take his time, despite the fact that the deli counter had been closed to customers for at least 30 minutes and the clerk was obviously aggravated. Her testimony that she positively identified Wallace from a group of police photographs on the morning after the robbery was also unimpeached. The descriptions given to police by the store employees were not so inconsistent as to be doubtful or unsatisfactory. Finally, there was additional circumstantial evidence of defendant's guilt. A vehicle, apparently abandoned in some haste, was found within an hour after the crime, only two miles from the store and eight miles from defendant's home, with defendant's identification card and address book left inside. Taken together, the direct and

circumstantial evidence presented was sufficient for a rational trier of fact to find, beyond a reasonable doubt, that an armed robbery was committed and that defendant was the person who committed it. Accordingly, the trial court's judgment will not be disturbed.

For the reasons stated, defendant's conviction is affirmed.

Affirmed.

LORENZ, P.J., and MURRAY, J., concur.