THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MAYFAY MELTON *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—94—2308 through 1—94—2312, 1—94—2424 cons.

Opinion filed July 5, 1996.

Rita A. Fry, Public Defender, of Chicago (Beth Ilyse Solomon, Assistant Public Defender, of counsel), for appellants.

Jack O'Malley, State's Attorney, of Chicago (James E. Fitzgerald and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HOURIHANE delivered the opinion of the court:

Following a bench trial, defendants Mayfay, Cassandra, Maxine, Diana, and Denise Melton (sisters) and Gregory Turner were convicted of multiple counts of endangering the health of a child and contributing to the dependency and neglect of a child. Maxine Melton was sentenced to a term of imprisonment. All other defendants were sentenced to probation and a term of imprisonment.

On appeal, defendants argue that their convictions for endanger-

ing the health of a child must be reversed since defendants were charged, tried and convicted under a prior version of the endangerment statute not in effect at the time of the events alleged in the complaint; that the State had not proved their guilt beyond a reasonable doubt; that the admission of certain hearsay statements denied them their right to a fair trial; and that their convictions under both the endangerment and neglect statutes violate the one-act-one-crime doctrine. For the reasons set forth below, the judgment of the trial court is affirmed in part and vacated in part.

## BACKGROUND

From November 1993 to February 1, 1994, five sisters, Cassandra, Denise, Diana, Maxine and Mayfay Melton, their mother (Josephine Melton), a brother (Johnnie Melton), and Gregory Turner, Sr., resided in the first-floor apartment at 219 North Keystone, Chicago, along with 19 children, ranging in age from 17 months to 14 years.

At approximately 10:30 p.m. on February 1, 1994, Chicago police officers Sarpalius, Warner, Labiak and Kasupski, acting on information that drugs were being sold from this address, arrived at the apartment and spoke to Maxine Melton at the door. She advised the officers that no drugs were being sold, but that they "can look."

Upon entering the apartment and observing living conditions which the trial court would later describe as "barely fit for animals," Officer Sarpalius called for a supervisor. Subsequently, additional units were called to assist in the transport of the 19 children to a facility of the Department of Children and Family Services. An evidence technician was also called.

At approximately 11:30 p.m., Josephine Melton arrived. She told police that she lived there and that she did not know where the other residents were, but could find them. At approximately 1 a.m. she returned with three of her daughters, Cassandra, Mayfay and Denise, but they were refused entry by the police. The removal of the children from the apartment was completed by 2 a.m.

Appellants, along with Johnnie Melton, were subsequently charged with multiple counts of child endangerment and contributing to the dependency and neglect of a child. At a bench trial, police officers testified for the State to the foregoing facts and as to the condition of the apartment and the children on the night of February 1, 1994. Specifically, upon entering the apartment that evening, two small children were observed sitting on the floor next to a radiator. The window next to the radiator was broken and when Officer Sarpalius asked Maxine Melton why she didn't move the child, she replied, "It's not my child."

In the living room, the police observed four or five children, clothed only in dirty underwear and diapers, huddled on a bare, filthy mattress, covered with a dirty blanket. Other children were sleeping on a blanket on the floor, also covered by a single dirty blanket. One of the children was naked. Maxine Melton stated that she did not know how many children were in the apartment, although five of them were hers, nor did she know where the other children's mothers were.

More children were found in the dining room, sleeping on another bare, filthy mattress. These children were also clothed in only dirty underwear and diapers. Cockroaches were crawling on the dirty blanket that covered them. There was only one dirty and stained pillow in the areas where the children were sleeping. There was a hole in the wall of the dining room with an electrical cord running through it, which was attached to a television. The cord was a foot or two from the mattresses.

One of two bedrooms was occupied by Gregory Turner, who was found lying in bed watching TV. Turner told police that Gregory Jr. was his son. The other bedroom belonged to Johnnie Melton. Both bedrooms had mattresses with sheets and blankets cleaner than those police observed in the living room and dining room.

The bathroom was filthy. The light fixture did not work. The cold water faucet in the sink could not be shut off. There were no towels, soap, shampoo, toothpaste or other toiletries, other than a single roll of toilet paper and a jar of unidentified cream.

The kitchen floor was covered with garbage, including grease and bones. Subsequent to the arrival of the police, Lavelle Melton, the 14 year old, with help from Maxine Melton, tried to clear some of the garbage off the kitchen floor with a snow shovel. The sink was full of dirty, crusty dishes and empty milk containers. All of the food in the refrigerator, which was infested with cockroaches, was stale and rotten. The kitchen stove was covered with grease, inside and outside. The pantry contained some canned goods, but cockroaches crawled in and out of open boxes of rice and cereal, as well as up and down the shelves and walls.

There were piles of dirty, damp and crusty clothes all over the apartment and the police had difficulty finding clean clothes that fit the children. Maxine Melton dressed her own children, but could not tell police where clothes could be found for the others. Shoes and socks could not be found for most of the children, nor could clean diapers. Officer Gutierrez had to shake cockroaches off the clothes during her search. Some of the children were dressed in adult windbreakers which the police found in the apartment.

There were no smoke detectors. The paint on the walls was peeling. There were no school supplies or books. The children had terrible body odor.

Also testifying for the State was Debra Wright, the prior tenant. She resided in the Melton apartment from June 1992 until February 1993. She testified that at the time she vacated the apartment, to take the larger one upstairs, it was in nice condition. She had repainted the living room and dining room, there were no holes in the walls, and the landlady was quick to respond if there were problems. She also stated that she had cockroaches in her apartment and that she was eventually evicted after a building inspector viewed the premises. She further testified that at least once a month she saw people carrying groceries into the Melton apartment.

The parties stipulated that all five sisters, as well as two other members of the household, received public aid and food stamps and that the combined monthly and annual income for the household from these sources were $5,496 and $65,952, respectively. The poverty level for this size household was $71,340.

The parties further stipulated that Lavelle Melton, the 14 year old, was not enrolled for the 1993-94 school year and that for the period November 15, 1993, through January 1994, Dominick Melton, Claudell Melton, and Johnny Melton (three of Maxine's children) had been absent from school 25, 17 and 13 days respectively, and that Leon Melton (one of Mayfay's children) had been absent for 26 days.

Lavelle Melton, Sabrina Smith, and Cassandra Henderson Melton testified on behalf of defendants. Lavelle stated that when he went to sleep on February 1 there was no garbage, and it was only after the police arrived that the garbage appeared. He admitted that his mother would sometimes be gone for days.

Sabrina Smith, a lifelong friend of the Meltons, generally testified as to the condition of the apartment in March 1993. She noticed that it needed painting and that there were patched holes in the walls.

Cassandra Henderson Melton, a cousin, testified that she took Maxine shopping every month, since Maxine did not have a car. She testified in great detail as to the numerous food and other household items that were purchased on their most recent trips on January 20 and 21, 1994. She stated that some of the food was stored at her house, since there was not enough room in Maxine's apartment. Cassandra also testified that she went clothes shopping with her cousins on a monthly basis and that her cousins used a public laundromat since they did not own a washing machine.

Cassandra testified that on February 2, 1994, Denise called and

Cassandra took her to the police station. Thereafter, Cassandra, her husband, and Josephine Melton returned to the apartment. They entered through the back door; the front was nailed shut. She testified that the kitchen was torn up, the house was demolished and there was garbage all over the floor. Although clothes were strewn about, clean clothes and diapers were visible.

Finally, Cassandra testified that at the time Maxine moved in, tile was coming off the kitchen floor and the sink was rusted. Also, wood from the bathroom floor was coming up, and some ceiling tiles were missing. Cassandra stated that Maxine had plastered and repainted the apartment and that on January 29, 1994, when she visited her cousins, there was no trash on the floor and the kitchen was clean.

The trial judge found Johnnie Melton, who was not a father to any of the children, not guilty of all charges. The remaining defendants (appellants here) were found guilty as follows: Cassandra Melton, three counts each, endangerment and neglect; Denise Melton, two counts each, endangerment and neglect; Diane Melton, one count endangerment, two counts neglect; MayFay Melton, four counts each, endangerment and neglect; Maxine Melton, five counts each, endangerment and neglect; Gregory Turner, Sr., one count each, endangerment and neglect.

## ANALYSIS

### I

Defendants first maintain that their convictions under the child endangerment statute must be reversed, since the statute under which they were charged and convicted was repealed effective September 9, 1993, and thus was no longer in effect at the time of the events at issue here. Defendants argue that they were charged with a "non-existent crime." We disagree.

Defendants were charged under section 4 of the Wrongs to Children Act (720 ILCS 150/4 (West 1992)). The statute provides as follows:

> "It shall be unlawful for any person having the care or custody of any child, wilfully to cause or permit the life of such child to be endangered, or the health of such child to be injured, or wilfully cause or permit such child to be placed in such a situation that its life or health may be endangered." 720 ILCS 150/4 (West 1992).

A first violation of this statute was a Class A misdemeanor; a second or subsequent conviction was a Class 4 felony. 720 ILCS 150/5 (West 1992).

The successor to this statute, effective September 9, 1993, is contained in article 12 of the Criminal Code of 1961. It reads:

"It is unlawful for any person to willfully cause or permit the life or health of a child under the age of 18 to be endangered or to willfully cause or permit a child to be placed in circumstances that endanger the child's life or health. A violation of this Section is a Class A misdemeanor. A second or subsequent violation of this Section is a Class 3 felony." 720 ILCS 5/12—21.6 (West 1994).

■ There is no doubt that child endangerment was a criminal offense prior to September 9, 1993, and that it remained so after that date. Further, the new statute left intact the substance of the prior enactment and merely broadened its scope by (i) permitting "any person" to be charged, rather than only those persons "having the care or custody of any child," and (ii) by making the statute specifically applicable to children under the age of 18, rather than only to children under the age of 14, as the prior statute had been interpreted. See *People v. Vandiver*, 51 Ill. 2d 525, 528 (1971). Thus, acts that constituted child endangerment under the former statute still constitute child endangerment under the current statute. Although the statute cited in the charging documents was no longer in effect, the criminal offense of child endangerment was still embodied in the Criminal Code. Accordingly, defendants' claim that they were convicted of a nonexistent crime is without merit.

■ Further, we find this court's prior decision in *People v. Dismore*, 33 Ill. App. 3d 495, 342 N.E.2d 151 (1975), controlling. In *Dismore*, defendants were charged and convicted of deceptive practices under a section of the Criminal Code that had previously been repealed. However, the statute had been reworded and incorporated, in substance, into the Illinois Credit Card Act (Ill. Rev. Stat. 1973, ch. 121$^1$/$_2$, par. 601 *et seq.*). We held that the defendant's conviction under the repealed statute was not void. In so ruling, we observed that the defendant had failed to claim or demonstrate any prejudice resulting from the State's miscitation of the statute in the criminal complaint. Indeed, the defendant was apprised of all the elements of the offense intended to be charged. Only where the defendant demonstrates prejudice will the mere fact that a criminal complaint contains an incorrect citation to the criminal statute be grounds for dismissal of the conviction. *Dismore*, 33 Ill. App. 3d at 498. See also *People v. Witt*, 227 Ill. App. 3d 936, 592 N.E.2d 402 (1992) (where indictment sufficiently informs defendant of charges and defendant cannot demonstrate prejudice from incorrect statutory citation, defect is formal and reversal is not warranted); *People v. Cooper*, 17 Ill. App. 3d 934, 308 N.E.2d 815 (1974) (miscitation to criminal statute is formal, nonjurisdictional defect and not ground for reversal).

Like *Dismore*, defendants here do not argue that they were

prejudiced by the miscitation. Rather, they admit that the complaints "fully conformed to expectations in citing elements and a statutory charge." Defendants further admit that their ability to prepare for trial was not hampered. The only basis on which defendants distinguish *Dismore* from the case *sub judice* is that no guilty pleas were entered here to "lessen defendants' ability to challenge their convictions."

While it is true that a guilty plea was entered in *Dismore*, this fact is significant only because defendant was not, therefore, "hampered in the preparation of a defense." *Dismore*, 33 Ill. App. 3d at 499. Thus, it is the ability to prepare for trial, rather than the plea that is entered, that is the critical fact. As already indicated, however, defendants here claimed no inability to prepare for trial by virtue of the State's miscitation.

We note, too, that by proceeding under the former version of the endangerment statute, defendants actually benefitted. The threshold of proof is greater under the former statute since the State must establish, in addition to the actual endangerment, that the defendant had either care or custody of the child. This requirement was removed under the new statute and "any person" may be charged. Thus, the defendants here were each charged and convicted of endangerment only with respect to their own children, without regard to their culpability, if any, in endangering the health of their nieces and nephews.

Defendants also benefitted to the extent that charges in relation to the endangerment of Lavelle Melton, the 14 year old, were dismissed. Although such charges would have withstood scrutiny under the new law because of the increased age limitation, they were clearly not actionable under the former statute.

Under these circumstances, the fact that a former section of the Wrongs to Children Act was repealed, reworded, and incorporated into the Criminal Code does not give rise to a violation of any of defendants' statutory or constitutional rights. Although the defendants were not "perfectly" charged, they were "properly" charged. *Dismore*, 33 Ill. App. 3d at 499.

■ Finally, we note that where, as here, the sufficiency of the charging documents is first challenged on appeal, strict compliance with the statutory requirements set out in section 111—3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—3 (West 1994)) is not required. *People v. Hinton*, 259 Ill. App. 3d 484, 487-88, 631 N.E.2d 773 (1994); *People v. Libbra*, 268 Ill. App. 3d 194, 197, 643 N.E.2d 845 (1994). It is enough that the information or indictment, when read in its entirety, was sufficient to enable defendants to prepare a defense.

*Hinton*, 259 Ill. App. 3d at 488. While this court does not seek to minimize the State's error, we find that it is not grounds for reversal of defendants' convictions.

## II

We next consider whether the State proved defendants' guilt beyond a reasonable doubt as to both the endangerment and neglect charges. When presented with a challenge to the sufficiency of the evidence of a criminal conviction, the test to be employed on review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Schott*, 145 Ill. 2d 188, 203 (1991).

■ In connection with the endangerment counts, defendants erroneously claim that the State was required, and failed, to prove the actual infliction of personal injury on the child. Evidence of actual injury is a requirement only under that portion of the endangerment statute regarding "injuring the health" of a child. It is not a requirement under the portion of the statute dealing with "endangering the life" of a child. *People v. Wilkenson*, 262 Ill. App. 3d 869, 874, 635 N.E.2d 463 (1994). Defendants here were charged in the alternative as having "willfully [*sic*] permitted the life of such child to be endangered, or the health of such child to be injured, or wilfully caused or permitted such child to be placed in such a situation that its life or health may be endangered." Thus, the absence of proof of an actual injury was not fatal to the State's case.

■ Defendants further assert that the State failed to prove the defendants acted with the requisite mental state of wilfulness. Wilful conduct is synonymous with knowing conduct. 720 ILCS 5/4—5 (West 1994); *People v. Albarran*, 40 Ill. App. 3d. 344, 347, 352 N.E.2d 379 (1976). A person is said to act knowingly when he is consciously aware that his conduct is practically certain to cause the offense defined in the statute. 720 ILCS 5/4—5 (West 1994); *People v. Hall*, 273 Ill. App. 3d 838, 842, 652 N.E.2d 1266 (1995). Defendants argue that the State failed to present any evidence that defendants were "consciously aware" that living in the conditions present at their Keystone residence would be "practically certain" to endanger their children's health.

Knowledge, by its very nature, is ordinarily proven through circumstantial evidence, rather than direct proof. The State must present sufficient evidence from which an inference of knowledge can be made. *People v. Weiss*, 263 Ill. App. 3d 725, 731, 635 N.E.2d 635 (1994). Thus, defendants need not admit knowledge for the trier of

fact to conclude that defendants acted knowingly. *People v. Rader*, 272 Ill. App. 3d 796, 806, 651 N.E.2d 258 (1995).

■ The State argues that defendants made a "conscious choice" to live in conditions which the trial court stated were not even fit for animals, and to expose the children to these conditions, as well. We agree. We note initially that the condition of the apartment was the type of circumstance that could not go unnoticed and that there was no evidence from which it could be concluded that any of the defendants lacked the ability to appreciate their surroundings. Nor was there evidence that any of the defendants suffered some form of physical impairment that would have prevented a defendant from taking action to ameliorate the situation. In other words, the abysmal condition of defendants' residence did not happen by chance, accident, or natural disaster. Nor can this situation be dismissed simply as the by-product of poverty. The circumstances that were allowed to develop, from the piles of garbage on the kitchen floor to the body odor of the children, have little to do with poverty. Rather, they are the result of defendants' action and inaction. We agree with the trial court's observations that, after taking into account defendants' monthly rent of $380, defendants had, at their disposal, income in excess of $5,000 per month. While it is not clear how this income was spent, it is obvious how it was *not* spent.

Based on the graphic testimonial and photographic evidence presented at trial, a trier of fact could reasonably infer that the defendants wilfully caused or permitted their children's lives or health to be endangered, or to be placed in circumstances that endangered their lives or health.

■ Defendants also maintain that the State failed to prove beyond a reasonable doubt that the defendants were guilty of the offense of contributing to the dependency and neglect of a child. The neglect statute provides in relevant part as follows:

> "Any parent, legal guardian or person having custody of a child under the age of 18 years, who knowingly or wilfully causes, aids or encourages such person to be or to become a dependent and neglected child as defined in section 1, who knowingly or wilfully does acts which directly tend to render any such child so dependent and neglected, or who knowingly or wilfully fails to do that which will directly tend to prevent such state of dependency and neglect is guilty of the Class A misdemeanor of contributing to the dependency and neglect of children." 720 ILCS 130/2 (West 1994).

Section 1 of the neglect statute, in turn, defines a "dependent or neglected child" as:

"[A]ny child who while under the age of 18 years, for any reason is destitute, homeless or abandoned; or dependent upon the public for support; or has not proper parental care or guardianship; or habitually begs or receives alms; or is found living in any house of ill fame or with any vicious or disreputable person; *or has a home which by reason of neglect, cruelty or depravity on the part of its parents, guardian or any other person in whose care it may be is an unfit place for such child*; and any child who while under the age of 10 years is found begging, peddling or selling any articles or singing or playing any musical instrument for gain upon the street or giving any public entertainments or accompanies or is used in aid of any person so doing." (Emphasis added.) 720 ILCS 130/1 (West 1994).

The State's charges were premised on defendants' failure to "provide adequate clothing, food or supervision." Defendants dispute that the evidence presented supports the charges arguing, *inter alia*, that the police failed to thoroughly search the apartment for clothing, that there was evidence that additional food was stored elsewhere, that there was an absence of any evidence of malnutrition, and that there were three adults in the apartment when the police arrived.

■ However, there is ample evidence in the record from which a trier of fact could find against defendants, in particular, the photographic evidence, the testimony of the officers who initially entered the apartment, as well as the testimony of the officers who assisted in dressing and removing the children. We note that more than one officer testified that clean, dry clothes could not be located, thus forcing officers to dress some of the children in adult windbreakers. Although there was no evidence of malnutrition, the bulk of the limited food available in the apartment to the children was either spoiled or infested with roaches. The trial judge, who heard the testimony and determined the credibility of the witnesses, was apparently not persuaded by testimony from a cousin that food was being stored off site. Also, the statement of Maxine Melton to police that she did not even know how many children were in the apartment that night, and Lavelle Melton's testimony that his mother would sometimes be gone for days, as well as the stipulated school records, belie defendants' claim that there was no evidence of inadequate supervision. Thus, we find that the record here supports the trial court's finding of neglect.

### III

■ Defendants also argue that the trial court committed reversible error by permitting certain hearsay statements of one of the

children to come into evidence. The statement at issue was made to Officer Warner as she helped dress two little girls. The child, who could not be positively identified, allegedly asked the officer if she would be her mommy. The officer responded, "Would you like that?" The little girl said, "Yeah." The trial judge admitted the statement under the spontaneous declaration exception to the hearsay rule. A statement qualifies as a "spontaneous declaration" when the following factors are established: (1) the occurrence is sufficiently startling to produce a spontaneous and unreflecting statement, (2) there is an absence of time to fabricate, and (3) the statement relates to the circumstances of the occurrence. *People v. Patterson*, 154 Ill. 2d 414, 452 (1992).

As a reviewing court, we must presume that the trial court considered only competent evidence, unless the record affirmatively demonstrates otherwise. *People v. Wallace*, 210 Ill. App. 3d 325, 344, 568 N.E.2d 1332 (1991). Here, the trial court clearly made reference to the unidentified child's statement during the course of its ruling. However, even assuming that the statement was admitted into evidence in error, at most, it is harmless. The totality of the direct and circumstantial evidence that the court properly considered is sufficient to support defendants' convictions without reliance on the child's statement.

## IV

We next consider whether, as defendants maintain, their convictions under both the endangerment and neglect statutes violate the doctrine of *People v. King*, 66 Ill. 2d 551 (1977), sometimes referred to as the "one-act-one-crime rule." See *People v. Banks*, 260 Ill. App. 3d 464, 471, 632 N.E.2d 257 (1994). In *King*, our supreme court considered the propriety of multiple convictions for offenses committed during the same transaction. The court held:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. "Act," when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566.

While this appeal was pending, our supreme court reexamined the *King* doctrine and expressly declined to abandon it. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). In *Rodriguez*, the court concluded that defendant's convictions of both aggravated criminal sexual assault and home invasion were proper. The court reasoned that although both offenses shared the common act of defendant threatening the victim with a gun, defendant's unlawful entry into the victim's bedroom was an overt or outward manifestation that supported the different offense of home invasion. " 'As long as there are multiple acts *as defined in King*, their interrelationship does not preclude multiple convictions ***.' " (Emphasis in original.) *Rodriguez*, 169 Ill. 2d at 189, quoting *People v. Myers*, 85 Ill. 2d 281, 288 (1981).

Thus, under *King*, we must first determine whether defendants' conduct consisted of separate acts or a single act. Defendants' convictions under both the endangerment and neglect statutes are improper if based on the same physical act. *Rodriguez*, 169 Ill. 2d at 186. In determining whether a defendant's conduct consisted of a single act or multiple acts, this court has applied a six-factor test: the existence of an intervening act or event; the interval between successive parts of defendant's conduct; the identity of the victim; the similarity of the acts performed; whether the conduct occurred at the same location; and prosecutorial intent as reflected in the charging instrument. *People v. Crum*, 183 Ill. App. 3d 473, 490, 539 N.E.2d 196 (1989); *People v. Baity*, 125 Ill. App. 3d 50, 51-53, 465 N.E.2d 622 (1984). Without addressing the merits of this six-factor test, our supreme court in *Rodriguez* cautioned that, with respect to its application, "a court must not lose sight of the forest for the trees," and that the definition of an "act" remains simply what this court stated in *King*. *Rodriguez*, 169 Ill. 2d at 188.

Defendants argue that application of the six-factor test demonstrates that their convictions were based on the same act, to wit: The basis for both charges was the same. In the neglect charge, it was the defendants' failure to provide "clothing, food, or supervision." In the endangerment charge, it was permitting the children to live in "inadequate space, under insanitary [*sic*] conditions without sufficient provisions." There was no intervening event; the conditions at the apartment continued unabated from November 1993 to February 1994. The location of the acts was identical.

The State counters that the neglect charges were premised on defendants' failure to act, while the endangerment charges were premised on defendants' affirmative acts.

Mindful of the supreme court's cautionary note in *Rodriguez*, we

turn to the definition of "act" set out in *King*: "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566. Although the State attempts to differentiate the acts which support defendants' convictions under each statute, we are not persuaded that such a difference exists. Defendants' knowing failure to provide adequate clothing, food, and supervision during the three-month period from November 1993 to February 1994 (which supports the neglect charge) is indistinguishable from defendants' wilful conduct in permitting the children to be placed in a situation that endangered their lives or health. Considering defendants' conduct that satisfies the neglect charge, there is no overt manifestation that will support the different offense of neglect. Conversely, considering defendants' conduct that satisfies the endangerment charge, there is no overt manifestation that will support the different offense of endangerment. The State's assertion that, in one instance, defendants failed to act and, in the other, they took affirmative action, is unpersuasive. We see no difference between defendants' failure to provide adequate clothing, food and supervision, and defendants allowing the children to go without such provisions. These are simply two sides of the same coin. The State has offered no evidence of date-specific conduct or other clearly distinguishable acts by defendants that support both convictions. Thus, applying *King* to the present case, we conclude that the endangerment conviction and neglect conviction were based on the same act and thus are violative of the one-act-one-crime rule.[1]

We do not hold that a defendant may never be guilty of both endangerment and neglect, but only that under the facts present here both convictions cannot stand. Where only one conviction can stand, the rule in Illinois is that it should be the conviction for the more serious offense. *People v. Calva*, 256 Ill. App. 3d 865, 870, 628 N.E.2d 856 (1993). Here, both offenses have the same classification (Class A misdemeanor), and both require the same mental state.[2] Although this court may, under the circumstances, remand this matter

---

[1]The State admitted during oral argument that where defendants have committed several acts, each of which could support either charge, the State will simply parcel out the acts between the two charges. This approach, however, is contrary to *King* and *Rodriguez*.

[2]The endangerment statute, in either its former or present version, requires wilful conduct. 720 ILCS 150/4 (West 1992); 720 ILCS 5/12—21.6 (West 1994). The neglect statute requires wilful or knowing conduct. 720 ILCS 130/2 (West 1994). "Conduct performed knowingly or with knowledge is performed wilfully, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning." 720 ILCS 5/4—5 (West

to the trial court for clarification of which conviction should stand (see *People v. Segara*, 126 Ill. 2d 70, 78, 577 N.E.2d 802 (1988); *Calva*, 256 Ill. App. 3d at 870), we decline to do so and instead rule that defendants' convictions for contributing to the dependency and neglect of a child are vacated, and defendants' convictions and sentences for child endangerment will stand.

## CONCLUSIONS

For the foregoing reasons, the convictions and sentences for child endangerment are affirmed, but the convictions for contributing to the dependency and neglect of a child are vacated.

Affirmed in part and vacated in part.

GORDON and COUSINS, JJ., concur.

1994). The neglect statute does not clearly require another meaning be given to the term "knowingly."