# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-3661

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIC S. VENTERS,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06 CR 40064—**William D. Stiehl**, *Judge.*

_____

ARGUED MAY 15, 2008—DECIDED AUGUST 27, 2008

_____

Before RIPPLE, KANNE, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Police officers searched Eric Venters's house and tool shed and recovered materials and equipment they suspected were being used to manufacture methamphetamine. *See* 21 U.S.C. § 843(a)(6). Venters moved to suppress the items, but the district court denied the motion. We affirm.

## I. History

In August 2006, police officers in Mt. Vernon, Illinois, arrested Venters at his house while investigating a report that he neglected to care for his three young children. *See* 720 Ill. Comp. Stat. 130/2. The officers subsequently executed two search warrants on Venters's property, where they found various equipment and materials suspected to be used to manufacture methamphetamine. For instance, officers found in Venters's house large quantities of pseudoephedrine pills, numerous lithium batteries, a jar of liquid that tested positive for meth, and coffee filters that also tested positive for the drug; in a tool shed located behind Venters's house officers recovered more items that tested positive for meth, such as a blender covered with a white residue and a container of drain cleaner. Based on the items seized, a grand jury indicted Venters on one count of possessing materials and equipment for manufacturing meth while knowing that the items would be used to make the drug. *See* 21 U.S.C. § 843(a)(6).

Shortly after the grand jury indicted him, Venters filed a motion to suppress the items recovered from his residence on the basis that they were the "fruits of [an] unlawful entry." Specifically, Venters asserted that the police officers obtained the warrants to search his property only after they entered his house without a warrant while investigating the report of child neglect. But for that illegal entry, Venters argued, the officers would not have had the requisite probable cause to obtain the search warrants that allowed them to locate and seize the contraband found on his property.

The district court held a hearing on Venters's motion. Venters introduced no evidence in support of his motion, but the government presented two witnesses: Vanessa Shaw, a Child Protective Investigator with the Illinois Department of Children and Family Services (DCFS), and Officer Rodney Sweetin, a patrolman with the Mt. Vernon Police Department. Together, Shaw and Sweetin testified to the following:

On the morning of August 2, 2006, the DCFS central office in Springfield, Illinois, forwarded to Shaw at her office in Mt. Vernon a report of suspected child neglect. The report contained allegations made by Sue Houseworth, the stepmother of Venters's wife, Natalie, that Venters and Natalie had been neglecting to care for their three children: Steven (age seven at the time of the report), Ellen (age six), and Sebastian (age five).[1] Specifically, the report stated that the Venters' house was "filthy, stinks, and [was] full of human and animal feces," and that Sebastian "smear[ed] feces all over the house." The report further stated that Venters made, sold, and used meth. The report explained that Venters "used to make the drug in the shed behind the house," but that he had since moved his operations to a field. However, the report also recounted that Venters's son, Steven, had stated that "he goes with his daddy sometimes where his daddy cooks in the barn."

After reviewing the DCFS report, Shaw contacted Detective Sergeant Ken McElroy, the Mt. Vernon Police

---

[1] These names are pseudonyms. Out of concern for the children's privacy, we decline to use their real first names.

Department's Juvenile Officer, and explained to him the allegations contained in the report. McElroy, in turn, opined that they needed to confirm the allegations, so he and Shaw telephoned Houseworth. During their conversation, Houseworth both confirmed her initial report and elaborated on her description of Venters and his children. Houseworth explained that Venters had a history of using and manufacturing meth, and that he had been arrested for crimes related to the drug. She further described the Venters' house as "terrible"—"it was nasty and ha[d] an odor" because Venters both used and manufactured meth in it. In fact, Houseworth stated, when Steven, Ellen, and Sebastian visit her, she makes it a habit to bathe them and to give them clean clothes because "she can smell the meth" on the clothes that they are wearing. Houseworth further explained that "three or four days" earlier, Natalie was taken to Good Samaritan Hospital in Mt. Vernon after she was bitten by a spider, and that since then only Venters had been caring for the three children.

After Shaw and Sergeant McElroy spoke with Houseworth, they visited Natalie at Good Samaritan Hospital. Like her stepmother, Natalie stated that Venters was addicted to meth, and that because of his addiction his health had greatly deteriorated: he had "lost a lot of weight, [did] not sleep, and [looked] terrible." Natalie also stated that Venters was "probably" making the drug as well. When asked if Venters was making meth at their house, Natalie responded that although he had in the past, she did not think that he currently was. However,

Natalie could not confirm that Venters had not made the drug at the house since she had been in the hospital.

Shaw and Sergeant McElroy then decided to visit Venters's house to investigate the report of child neglect. While en route to the house, Shaw and McElroy met with Officer Sweetin, the patrolman on duty. McElroy recounted to Sweetin Houseworth's and Natalie's statements, and asked him to accompany them in the event that they had to arrest Venters for child neglect.

When Shaw, Sergeant McElroy, and Officer Sweetin arrived at Venters's house, McElroy and Sweetin walked up to the front porch to see if anyone was home, while Shaw remained behind in McElroy's car. Sweetin knocked on the front door, but received no response. Sweetin then peered through a set of windows located next to the door; he was able to see into the living room, and observed that there were feces on the floor and that the room was extremely cluttered. McElroy then began to "pound" on the front door "quite hard and loud[ly]." No one responded to McElroy either, and after he pounded on the door for "one to two minutes," he peered through another window next to the door and yelled to Sweetin and Shaw that he saw "a child on the couch" who "raised his head," but did not otherwise move. McElroy then opened the unlocked front door, announced the officers' presence, and yelled several times that they were there "to check on the welfare of the children." Although McElroy yelled at "the top of his voice," the child on the couch did not move.

Seeing that the child was not moving, Sergeant McElroy "went straight to the couch" to check on the child's wel-

fare, with Officer Sweetin immediately in tow. The child, who turned out to be Steven, had no clothes on, and had only a small blanket covering him. Sweetin asked Steven where his father was, but Steven responded that he did not know. Meanwhile, McElroy found Ellen and Sebastian in a nearby bedroom where they "appeared to be sleeping." The officers then called Shaw to come into the house.

Upon entering the house, Shaw found Ellen and Sebastian lying naked on a "very dirty mattress" with no sheets. Both children were "extremely dirty"; bloody mucus had collected under Sebastian's nose, and Ellen both exhibited sores on her body and had lost clumps of hair. Neither child immediately awakened when Shaw attempted to rouse them, and they were disoriented when Shaw eventually woke them up. Believing that the two children required immediate medical attention, Shaw asked Officer Sweetin to call for an ambulance. Shaw then asked Steven if he knew where his father was, or if he could tell her the last time that he had seen his father. Steven responded that he did not know where Venters was, and that the last time he had seen his father was the day before. The ambulance arrived shortly thereafter, and having found no clean clothing in the surrounding filth, Shaw and Sergeant McElroy wrapped the children in blankets and carried them out of the house.

While Shaw and Sergeant McElroy were waiting for the ambulance, Officer Sweetin walked to the rear of Venters's property to speak with a cable serviceman working there. After questioning the serviceman about whether he had seen any adults in the area, Sweetin

noticed that the tool shed behind Venters's house had an air conditioner installed in an opening on the door. Sweetin believed that someone was inside the shed because the air conditioner was running to combat the 100-degree heat; he accordingly knocked on the shed's door, but received no response. The lack of response led Sweetin to grow concerned that Venters was inside, but was unable to answer the door because he had injured himself or had fallen ill; this, Sweetin thought, would also explain why Steven had not seen him since the day before. Sweetin therefore opened the door, and saw Venters and another man sitting on the shed's floor. Sweetin informed Venters that he was under arrest for child neglect and took him into custody.

About two hours after Venters's arrest, police officers obtained a warrant to allow Shaw and other officers to re-enter Venters's house to photograph the conditions inside. While they were in the house, an officer located a small bag of marijuana sitting in plain view, and this discovery, in turn, led the officers to obtain a second warrant to search the house for drugs and drug-related paraphernalia. The second search turned up the items upon which the grand jury's indictment was based.

The district court took Venters's motion to suppress under advisement after hearing from Shaw and Officer Sweetin, and soon thereafter issued a written decision denying the motion. The court determined that Sergeant McElroy and Sweetin's warrantless entry into Venters's house was reasonable given the exigency of the situation, as was Sweetin's warrantless entry into Venters's tool

shed. Specifically, the court determined that upon "minimal investigation" both officers confirmed Houseworth's report of child neglect, and that their observations at the house led them to believe that the three Venters children were in danger. Likewise, the court continued, Sweetin's entry of the shed was reasonable because he acted out of concern that Venters was incapacitated inside. The court thus concluded that "the entry into the home and into the shed were fully warranted."

His motion to suppress having been denied, Venters entered into a conditional plea agreement under which he pled guilty to the one count of possessing materials and equipment used to manufacture meth. However, Venters also preserved his right to appeal the district court's suppression ruling. The district court accepted the agreement, and subsequently sentenced Venters to 188 months' imprisonment.

## II. ANALYSIS

On appeal, Venters challenges the district court's conclusion that Sergeant McElroy and Officer Sweetin's warrantless entry into his house was justified by exigent circumstances. As Venters sees it, the district court's determination that the officers had a reasonable belief that the Venters children were in danger finds no support in the record. In fact, Venters continues, the two officers' decision to enter the house was based on nothing more than "wild speculation" that a medical emergency existed inside, meaning that the officers' initial entry was illegal, and that the items that were subsequently

recovered were inadmissible as "fruits of the unlawful entry." Our review is *de novo*. *See United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006); *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000).

The Fourth Amendment prohibits a police officer from making an unreasonable entry into a house, *see United States v. Elder*, 466 F.3d 1090, 1091 (7th Cir. 2006), and an officer's warrantless entry into a house is presumed to be unreasonable, *see Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Groh v. Ramirez*, 540 U.S. 551, 559 (2004); *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001). However, the Fourth Amendment does permit an officer to enter a house without a warrant where there is (1) probable cause supporting the entry; and (2) exigent circumstances. *See Andrews*, 442 F.3d at 1000, *Rivera*, 248 F.3d at 680. "Exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant," *United States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998), such as when an officer must enter a premises "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," *see Stuart*, 547 U.S. at 403; *see also Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978) ("'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963))); *Elder*, 466 F.3d at 1090-91 (stating that officers' warrantless entries were justified to assure safety of individual who called 911). It falls to the government to show that exigent circumstances justified an officer's warrantless entry. *See Andrews*, 442 F.3d at 1000. And to

satisfy that burden, the government must establish that, based on "'the situation from the perspective of the officer[ ] at the scene,'" *Leaf v. Shelnutt*, 400 F.3d 1070, 1082 (7th Cir. 2005) (quoting *Marshall*, 157 F.3d at 482), the officer had "'an objectively reasonable basis for believing'" that such circumstances existed at the time of the entry, *Andrews*, 442 F.3d at 1000 (quoting *Rivera*, 248 F.3d at 680); *see also Stuart*, 547 U.S. at 404.

We agree with the district court that Sergeant McElroy and Officer Sweetin's warrantless entry into Venters's house was reasonable. On this record, it is clear that the officers' entry was supported by probable cause that Venters had committed child neglect. Probable cause exists if police officers "'possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that [the] suspect has committed, or is committing, a crime.'" *United States v. Hobbs*, 509 F.3d 353, 359-60 (7th Cir. 2007) (quoting *United States v. Brown*, 366 F.3d 456, 458 (7th Cir. 2004)); *see also United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001). And under Illinois law, a parent commits child neglect when he or she allows his or her children to live in a house that, "by reason of neglect, cruelty or depravity on the part of its parents," is an unfit place for the children. 720 Ill. Comp. Stat. 130/1; *see also id.* 130/2; *Illinois v. Melton*, 667 N.E.2d 1371, 1379 (Ill. App. Ct. 1996). Here, Houseworth reported that Venters was committing child neglect, and nothing about the information she provided rendered her untrustworthy. To the contrary, on two separate occasions she provided detailed allegations that Venters allowed his three children to live in a filthy

and feces-ridden house where he used and manufactured meth. Moreover, Houseworth's allegations were corroborated by Venters's wife, Natalie, and by Sweetin's observations from the porch of Venters's house, where he saw that the living room was extremely cluttered and that there were feces on the floor. We are thus comfortable stating that the officers had probable cause to believe that Venters had violated Illinois law by allowing his children to live in a house that his neglect and depravity rendered unfit. *See* 720 Ill. Comp. Stat. 130/1,130/2; *United States v. Huebner*, 356 F.3d 807, 816 (7th Cir. 2004) (concluding that probable cause existed when report of crime was detailed and corroborated by police investigation); *United States v. Butler*, 74 F.3d 916, 920-21 (9th Cir. 1996) (determining that probable cause existed for warrantless arrest when police officers' independent observations confirmed report of crime).

Moreover, exigent circumstances justified Sergeant McElroy and Officer Sweetin's entry into Venters's house. When the officers arrived at the residence, they knew from Houseworth and Natalie that, for the previous three-to-four days, the Venters children were living in a dangerous environment that posed serious threats to their well-being: a decrepit, unsanitary house with little or no adult supervision, and where their father regularly used, and probably made, meth in their presence. It is well documented that the noxious chemicals and toxic fumes created by the use and manufacture of meth pose great dangers to third parties, *see United States v. Layne*, 324 F.3d 464, 469-71 (6th Cir. 2003); Note, *Cooking Up Solutions to a Cooked up Menace: Responses to Methamphetamine in a Federal System*, 119 Harv.

L. Rev. 2508, 2511-12 (2006), Ill. Attorney Gen., *Meth Evils*, h t t p : / / w w w . a g . s t a t e . i l . u s / m e t h n e t / understandingmeth/evils.html (last visited Aug. 18, 2008), and that the chemicals and fumes pose acute dangers to children in particular, *see* Anne E. Hardwick, Comment, *Meth Manufacturing: Arizona Increases Protection for Children*, 39 Ariz. St. L.J. 297, 298-306 (2007); U.S. Dep't of Justice, *Information Bulletin: Children at Risk*, http://www.usdoj.gov/ ndic/pubs1/1466/ (last visited Aug. 18, 2008). Even more, the fact that Venters regularly exposed his children to the drug created the possibility that the children had ingested the drug some time before the officers arrived on the scene.

We are sure that Detective McElroy and Officer Sweetin immediately thought of the effect that meth and its by-products would have had on Steven when they saw him lying on the couch, at first unresponsive to McElroy's prolonged "pounding" on the door and "yelling," and then able only to "raise his head." As such, it was eminently reasonable for the officers to have feared that Steven's groggy movements meant that he was sick from meth fumes, was hurt from an accident that occurred while his father was making meth, had ingested the drug, or worse—all scenarios that would have required emergency medical attention. Simply put, there was nothing unrea- sonable about McElroy and Sweetin's belief that they needed to enter Venters's house to provide Steven emer- gency medical care, *see Stuart*, 547 U.S. at 403, and once inside, they were right to ensure the safety of his siblings as well, *Elder*, 466 F.3d at 1090-91 (stating that "consider- ations" of building's occupants' safety made police officers' brief warrantless entry "prudent").

Nevertheless, we wish to emphasize the narrowness of our determination that exigent circumstances justified Detective McElroy and Officer Sweetin's entry into Venters's house. The situation at the house was not one where McElroy's and Sweetin's knocks simply went unanswered; nor was it a situation where the officers saw that the children were healthy and unharmed inside, but yet unsupervised. Instead, it was a situation where McElroy and Sweetin (1) were aware that, for the three-to-four previous days, a drug-addicted father was left alone to "care" for his three young children, and that their house was in a state of extreme filth; (2) knew of credible and corroborated allegations that the father had exposed the children to meth in the past, including the manufacture of the drug, to such an extent that their clothing reeked of the drug; (3) observed that a small child inside the house did not immediately react to their prolonged pounding on the door; and (4) believed that the child's extremely delayed and lethargic reaction to the pounding suggested a medical problem caused by the dangerous environment in which he lived. And given these unique facts, the officers' belief that they needed to respond to a medical emergency inside was reasonable, and their entry into the house was prudent. *See United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (allowing warrantless entry of officers responding to report of domestic abuse: "This is a case where the police would be harshly criticized had they not investigated and [defendant] was in fact in the apartment. Erring on the side of caution is exactly what we expect of conscientious police officers.").

We come, then, to the district court's determination that Officer Sweetin's entry into the tool shed was reasonable. Notably, though, Venters abandons any challenge to the court's conclusion by failing to raise the argument in his brief. *See United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007); *United States v. Shorter*, 54 F.3d 1248, 1256 n.19 (7th Cir. 1995). But even if Venters had raised the point, his challenge would have been unavailing. As discussed, Sweetin had probable cause to believe that Venters had committed child neglect in violation of Illinois law. And in his uncontradicted testimony at the suppression hearing, Sweetin stated that he entered the shed believing that Venters could have been in there, yet was unable to respond to his knocks on the shed door because of illness or injury. This belief was reasonable; the fact that Steven had not seen Venters since the day before suggested that Venters was incapacitated somewhere. Sweetin's belief was also supported by (1) the fact that Venters was already suffering from extremely ill health from his meth addiction; (2) the chance that Venters could have overdosed on meth or could have taken a tainted version of the drug; and (3) the possibility that Venters could have suffered a life-threatening injury while manufacturing meth in the shed—the area where both Houseworth and Natalie stated that Venters had manufactured the drug in the past. We accordingly agree with the district court that Sweetin's entry into the shed was reasonable. *See Stuart*, 547 U.S. at 403; *Elder*, 466 F.3d at 1090-91.

### III. Conclusion

The district court did not err by denying Venters's motion to suppress. We thus AFFIRM Venters's conviction.