In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2533

WILLIAM K. HAWKINS,

*Plaintiff-Appellant*,

*v.*

RODNEY S. MITCHELL AND JAMES M. BOWERSOCK,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois, Urbana Division.
No. 2:10-CV-2111 — **Michael P. McCuskey**, *District Judge*, and
**David G. Bernthal**, *Magistrate Judge*.

ARGUED DECEMBER 2, 2013 — DECIDED JUNE 23, 2014

Before BAUER and FLAUM, *Circuit Judges*, and VAN
BOKKELEN, *District Judge*.[*]

VAN BOKKELEN, *District Judge*. We review summary-
judgment and trial rulings on several causes of action

[*] Of the Northern District of Indiana, sitting by designation.

against police who did not claim immunity under federal or state law.[1] The central legal doctrines are the exigency exception to the Fourth Amendment warrant requirement, probable cause, and the First Amendment right to consult an attorney.

## I. Facts

Two police officers—Rodney Mitchell and, about two minutes later, James Bowersock—responded to a 9-1-1 call by Sarah Bumgarner.[2] It was late on a Saturday night in May 2008. Bumgarner had called from outside William Hawkins's house on a residential street in Champaign, Illinois, reporting what the dispatcher classified as a domestic incident. On the way to the scene, Mitchell and Bowersock learned that Bumgarner and Hawkins had been drinking and got into a heated argument. Hawkins was alleged to have a history of abusiveness, but tonight's argument was "verbal only." The dispatcher summarized the situation: "Hawkins has locked [Bumgarner] out and her keys are in the residence. [Bumgarner] just wants her keys so she can leave."

Upon arriving, Mitchell discovered Bumgarner outside and shouting to Hawkins about her keys. Clothing was scattered across the yard. Mitchell remembers Hawkins "screaming" back to her from the porch: "I don't have your fucking keys!" Hawkins then stepped inside his house and

---

[1] District Judge McCuskey made the summary-judgment rulings; the trial rulings are Magistrate Judge Bernthal's.

[2] Bumgarner's name later changed to Gerth.

slammed the door. In irreconcilable contrast, Hawkins's account is that he was in bed asleep when Mitchell arrived.

It is undisputed that Bumgarner verbally confirmed with Mitchell that she was not injured; he observed no injury to her. She said she was "sorry" for calling 9-1-1, but needed her keys so she could leave. Bumgarner told Mitchell that Hawkins had her keys and that he "gets violent sometimes." On the other hand, Bumgarner also told Mitchell directly what she had already reported on the 9-1-1 call—her fight with Hawkins had been "verbal only." Bumgarner made no allegation that Hawkins was violent or threatening on that night.

Mitchell went to Hawkins's door and knocked. Hawkins opened, and, according to Mitchell, yelled "I don't need to talk to you!"; then attempted to close the door. But Mitchell stuck his foot in the path of the door, which prevented Hawkins from closing it. Mitchell entered the home.

Hawkins made clear that he wanted Mitchell gone, but Mitchell persisted in questioning Hawkins. Hawkins then called an attorney, with whose assistance Hawkins confirmed from Mitchell that he did not have a warrant. Mitchell nevertheless stayed in the house and told Hawkins he just wanted to talk to him. Again following the attorney's advice, and still on the phone, Hawkins asked Mitchell whether he was under arrest. Mitchell said Hawkins was not under arrest and reiterated that he just wanted to talk to Hawkins. The attorney advised Hawkins that Hawkins had no duty to speak to the officer, that the officer had no right to be in his house, and that Hawkins could just tell the officer to "get the fuck out of the house."

That's what Hawkins did, several times over the course of the encounter. For his part, Mitchell was comfortable with Hawkins on the phone because the conversation was allowing time for Bowersock to reach the scene.

When Bowersock did arrive, Mitchell motioned him inside the house. Hawkins remained on the phone and continued yelling for Mitchell to get out. (Whether Hawkins was immediately aware of Bowersock's presence is unclear.)

Mitchell remembers Bowersock then telling Hawkins that the officers were investigating a 9-1-1 domestic call and that Hawkins had to get off the phone and speak to Mitchell. Hawkins did not obey, and instead, in Mitchell's words, continued to give the officers "some kind of commands." "At that point," Mitchell explained, "Officer Bowersock told [Hawkins] to get off the phone and speak with this officer, or [he would] be arrested." Hawkins did not comply, at which point Bowersock told him he was under arrest. At the same time, according to Mitchell, Bowersock grabbed Hawkins's left wrist and Mitchell grabbed Hawkins's right wrist. Hawkins then allegedly "stopped and started twisting to resist arrest." The three ended up struggling to the floor. Mitchell says Hawkins continued "trying to pull his hands inward, which is common for someone in that position to try to keep from being arrested." Hawkins continued to protest what he claimed was a violation of his rights, and resisted the officers as they escorted him out of his house and into a police car.

Bowersock's recollection of those events is substantially the same as Mitchell's. When asked what Hawkins said after Bowersock told him he was under arrest, Bowersock recalled:

He did make a response. I believe it was something to the effect that he wasn't – or he hadn't done anything wrong, that this was his house and basically for us to get out of his house. He then tensed up and started to pull away, at which time we attempted to maintain control of him. Forward momentum had started and all three of us had gone to the floor.

At 11:46 p.m., about five minutes after Mitchell arrived and about three minutes after Bowersock arrived, they reported Hawkins in their custody. The state filed charges against Hawkins, but later dropped them.

## II. Procedural History

Hawkins sued the officers for the arrest and the allegedly excessive force they used in making it. He claims he needed surgery to remove a cyst from above his left eye where he was injured by the officers, as well as psychiatric counseling for the traumatic encounter. The case proceeded in the district court to the filing of cross-motions for summary judgment with six counts of an amended complaint pending.

Count I was for "Illegal Seizure," alleging that the officers "illegally seized and effected a custodial arrest of the plaintiff without probable cause for such arrest and without a judicial warrant." Count II was for excessive force. Count III claimed "Arrest in Retaliation for Speech," on the theory that Mitchell and Bowersock arrested Hawkins in retaliation for exercising a First Amendment right to speak to an attorney and asserting his Fourth Amendment right to privacy in his home. In Count IV, Hawkins sued for battery under Illinois common law. Count V was for "Wilful and

Wanton Misconduct." Count VI, titled "False Imprisonment/Locomotion," was based on the allegations that the Defendants, "through a show of force and their law-given authority," prevented Hawkins from telephoning with his attorney and forced him "to leave his own home under threat of force and bodily injury."

Though Hawkins's amended complaint invokes the Illinois Constitution in Counts I, II, and III, and the Illinois Civil Rights Act of 2006 in Counts III, V, and VI, he has not relied on those laws in this Court. The only sources of rights that Hawkins persists in claiming were violated are as follows for the remaining counts, with the trial-court disposition in the right column:

| I. Illegal Seizure | Fourth Amendment | Summary judgment for defendants |
|---|---|---|
| II. Excessive Force | Fourth Amendment | Defense verdict at trial |
| III. Arrest in Retaliation for Speech | First Amendment | Summary judgment for defendants |
| IV. Battery | Illinois common law | Defense verdict at trial |
| V. Wilful and Wanton Misconduct | Illinois common law | Defense verdict at trial |
| VI. False Imprisonment / Locomotion | Illinois common law | Summary judgment for defendants |

The district court paired Counts I and VI under the heading "False Arrest Claims" in its summary-judgment order and addressed them as one. *See Hawkins v. Mitchell*, 909 F. Supp. 2d 1011, 1020–24 (C.D. Ill. 2012). Relying in part on Hawkins's failure to object to the magistrate judge's ruling in dismissing a claim for trespass that "Defendants could lawfully enter Plaintiff's home to help Plaintiff's girlfriend, who asked for assistance to collect her belongings," the court concluded the officers' entry into Hawkins's home did not violate his constitutional rights. *Id.* at 1022. The district court stated further, "when Defendants entered the home, they attempted to get information from Plaintiff about the situation and Plaintiff refused to provide any information." *Id.* at 1023. In the view of the district court, that gave the officers "probable cause to arrest Plaintiff for either theft of Sarah's keys or disorderly conduct." *Id.* The district court quoted *Padula v. Leimbach*, 656 F.3d 595, 601 (7th Cir. 2011): "'Probable cause is an absolute defense to a wrongful arrest claim asserted under [42 U.S.C.] § 1983 against police officers.'" *Hawkins*, 909 F. Supp. 2d at 1022. Summary judgment was thus granted against Hawkins on Counts I and VI.

The district court further rejected Hawkins's contention that he had a First Amendment right to consult his attorney during the encounter and therefore threw out Count III, as well. *Id.* at 1024.

The summary-judgment order addressed Count V, for wilful and wanton misconduct, by recognizing that no such stand-alone cause of action exists under Illinois law. Counts IV and V were read "together to allege common law battery claims which avoid the application of the Illinois Tort

Immunity Act." *Id.* at 1025. On appeal, Hawkins has adopted this view, referring to Counts IV and V collectively as "wilful and wanton battery." (Appellant's Br. 36.)

Hawkins proceeded to trial on his wilful-and-wanton-battery and excessive-force claims (Counts II, IV, and V). There, the magistrate judge instructed the jury that "[t]he lawfulness of Defendants' entry into Plaintiff's home or his arrest [was] not at issue." Nonetheless, defense counsel emphasized in closing argument that his clients had the right to be in Hawkins's home. The argument focused on circumstances that tended to suggest that arresting Hawkins was lawful. All the jurors needed to find, defense counsel argued, was that "[t]he officers did their job. Bill Hawkins … mistakenly told them that they had to leave his home." The jury decided in favor of the officers on both claims.

Hawkins now asks us to reverse the summary-judgment order and jury verdicts against him, grant summary judgment in his favor on Counts I through VI, and remand for a trial on damages.

### III. Discussion[3]

### A. Standard of Review for Counts I, III, and VI

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), but only then. *E.g.*, *Brooks v. City of Aurora*, 653 F.3d 478, 483 (7th Cir. 2011). The review of a grant of summary judgment is *de novo*, with all reasonable inferences of fact drawn against summary judgment. *Id.*

### B. Count I: Illegal Seizure

We differ from the district court in that we find it necessary to analyze Count I separately from Count VI, which was for false imprisonment. It is true that Count I includes the theory that the arrest was illegal because the officers lacked probable cause. In this respect, the law on

---

[3] When, as here, police officers are sued under 42 U.S.C. § 1983 for allegedly violating constitutional rights, qualified immunity often proves to be the decisive rule of law. *Cf. Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (allowing courts to dispose of claims against public officials for violating constitutional rights without considering whether a right was violated, by determining that it was in any event not "clearly established"). This opinion does not address qualified immunity in substance, however, because Mitchell and Bowersock did not discuss it on appeal. And, while "[w]e can 'affirm on any ground supported in the record, so long as that ground was adequately addressed in the district court and the nonmoving party had an opportunity to contest the issue,'" *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (quoting *Peretz v. Sims*, 662 F.3d 478, 480 (7th Cir. 2011)), the officers' briefing in the district court did not ensure the fulfillment of those criteria with respect to qualified immunity.

Count I is very similar to the law on Count VI.[4] But three features of Count I, considered together, lead us to construe it to encompass the additional theory that the officers violated the Fourth Amendment, regardless of probable cause, by arresting Hawkins in his home without a warrant. First, the amended complaint refers to Count I as a claim for "illegal seizure," rather than false arrest. Second, Count I incorporates the preceding paragraphs of the amended complaint, which allege that the arrest occurred in a private residence. And third, Count I avers that the arrest was warrantless.[5] Count VI does not involve this theory of liability.

The officers' defense to Count I on appeal is that Mitchell could force his way inside the home in the name of preventing a serious injury or "questioning [Hawkins] about the situation." Having thus lawfully entered the home, the officers contend, they could arrest Hawkins upon probable cause to arrest for any offense. According to this view, and contrary to Hawkins's position, the lack of a warrant and in-home location did not mean the offense for which the officers had probable cause to arrest had to be more serious.

---

[4] Very similar, but not necessarily identical in the abstract. For a constitutional claim asserted under 42 U.S.C. § 1983, such as Count I, the doctrine of qualified immunity generally would be in play, unless the public-official defendants waive or forfeit the defense. In contrast, for a claim grounded in Illinois law, such as Count VI, Illinois's Local Governmental and Governmental Employees Tort Immunity Act would typically be under consideration instead.

[5] The amended complaint does not support the interpretation of Count I that Hawkins implied in his appellate briefs, which is that Count I was a claim for merely entering his home unconstitutionally.

Hawkins's arguments likewise depend on the constitutionality of the initial entry of his home.

Construing the magistrate judge's unchallenged ruling that "Defendants could lawfully enter Plaintiff's home" as limited to the trespass count that is not before us, we believe we may address the merits of Count I, including the lawfulness of the officers' home entry, and do so here.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated … ." U.S. Const. amend. IV. "[P]hysical entry of the home is the chief evil" that this constitutional guarantee targets. *United States v. United States District Court for the E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972). "At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). So it is "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). The Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a *routine* … arrest," even for a felony, and even with probable cause. *Id.* at 576 (emphasis added).

What about circumstances that are not routine? "[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), which are few, "'specifically established,'" and "'well-delineated'" to accommodate those extraordinary

situations where "the needs of law enforcement [are] so compelling that warrantless search is objectively reasonable." *Mincey v. Arizona*, 437 U.S. 385, 390, 394 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) and citing *McDonald v. United States*, 335 U.S. 451, 456 (1948)). This entails the doctrine of exigent circumstances, which "exist when there is a compelling need for official action and no time to secure a warrant, such as when an officer must enter premises to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *United States v. Venters*, 539 F.3d 801, 807 (7th Cir. 2008) (quotation marks and citations omitted). The "need 'to prevent the imminent destruction of evidence'" is another recognized exigency, *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011) (quoting *Stuart*, 547 U.S. at 403), albeit one that depends on the gravity of the crime under investigation. *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984); *see also Sutterfield v. City of Milwaukee*, No. 12-2272, — F.3d —, 2014 WL 1853080, at *12 (7th Cir. May 9, 2014) (identifying other exigencies).

Analysis of the reasonableness of police officers' exigency determination is entirely objective; it considers only what they reasonably should have known at the time of their warrantless home entry. *Venters*, 539 F.3d at 807.

As the above discussion suggests, warrantless in-home arrests are especially suspect "when the underlying offense for which there is probable cause to arrest is relatively minor." *Welsh*, 466 U.S. at 750. In such an instance, the "presumption of unreasonableness is difficult to rebut"; "the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral

and detached magistrate." *Id.* (footnote omitted). This Court has read *Welsh*, 466 U.S. at 752–54, to hold "that, at a minimum, exigent circumstances do not exist when the underlying offense is minor, typically a misdemeanor." *Reardon v. Wroan*, 811 F.2d 1025, 1028 (7th Cir. 1987) (per curiam).

A Fourth Amendment "seizure" of a person occurs "whenever a police officer 'by means of physical force or show of authority … in some way restrain[s] the liberty of a citizen.'" *Acevedo v. Canterbury*, 457 F.3d 721, 725 (7th Cir. 2006) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Where, as here, the seizure involves the use of physical force, a seizure occurs whenever "an officer restrains the freedom of a person to walk away," *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), such as by the "laying on of hands or [other] application of physical force to restrain movement, even … unsuccessful[ly]," *California v. Hodari D.*, 499 U.S. 621, 626 (1991). (Of course, seizure of a person without physical contact is also possible—the officer must make a "show of authority" that a reasonable person would understand to mean that she is not "free to leave," and she must submit to that show of authority. *See id.* at 626–27.)

We return to the two purposes Mitchell and Bowersock have offered as substitutes for a warrant: the need to prevent imminent serious injury, *see, e.g.*, *Stuart*, 547 U.S. at 404 (recognizing this as an exigency), and "the purpose of questioning [Hawkins] about the situation." (*See* Appellees' Br. 13–17.) Exigency case law makes clear that the latter, which amounts to ordinary investigation of possible crime, does not qualify. *See, e.g.*, *Venters*, 539 F.3d at 807 (situation must present a "compelling need for official action [with no]

time to secure a warrant"). And the facts, even as given by the officers, simply do not support the conclusion that the challenged arrest (or home entry) was necessary to prevent imminent serious injury.

Mitchell and Bowersock arrived at a disorderly scene, to be sure, having been told that Hawkins had some history of abusing Bumgarner and that he "gets violent sometimes." One could see that a couple was in a drunken spat, and clothing was strewn around the front yard. But the officers were also advised that no physical attack had occurred that night. Bumgarner told them she wasn't hurt, which Mitchell visually confirmed was true. Bumgarner even went as far as to say "she was sorry for calling" 9-1-1. Rather than express a need for protection from an immediate threat to her safety, Bumgarner said: "Mr. Hawkins has my keys and I just want them back so I can leave." She was outside; Hawkins was inside; and there was no basis to believe that anyone but the police had a weapon.

This is not to say that Mitchell was unreasonable to knock on the door to investigate Hawkins from a publicly accessible area. On the contrary, attempting to initiate a consensual conversation was commendable. And police are allowed to act upon exigencies of their own making, so long as their conduct in creating the exigency was "reasonable" under the Fourth Amendment. *Kentucky v. King*, 131 S. Ct. at 1858.

Mitchell's nonconsensual and warrantless home entry, however, was unreasonable. Assume that Hawkins roared into the night that he didn't have Bumgarner's keys. Assume that he threw her clothes into the yard, deliberately locked her out of his house, "screamed" in terror upon discovering

a police officer at his door, and then attempted to close the door on the officer. There's still no evidence that he threatened to harm anyone physically. "[S]ociety would recognize a person's right to choose to close his door on and exclude people he does not want within his home." *United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991). It is "one of the most … important components of a person's privacy expectation in his home." *Id.* So there was no exigency before Mitchell's nonconsensual entry.

Nor did one arise from that moment until the arrest. Throughout the in-home encounter, Hawkins objected to the officers' presence repeatedly and vociferously, it's true, but he never threatened them. Drunk as the officers allege him to have been, he summoned the wherewithal to call an attorney for advice and then follow that advice assertively but without physical aggression.

Although Mitchell's position inside the house initially gave Bowersock a reasonable basis to act as though he had consent or exigency, we find that by the time of the arrest, Bowersock, too, should have known there was neither. The lack of weapons, threats, or physical aggression from Hawkins left time for Bowersock to ask Mitchell why they were inside and to recognize the absence of any possible justification for staying. Knowing that warrantless home entry is presumptively unreasonable, *see Payton*, 445 U.S. at 586, Bowersock should have taken advantage of that opportunity. Instead, he responded to Hawkins's nonthreatening disobedience by telling him that if he didn't

get off the phone and speak to the officers, he would be arrested.[6]

Hawkins did not submit to Bowersock's command, insofar as he stayed on the phone, but he also remained nonthreatening. Each officer nevertheless proceeded to grab one of Hawkins's wrists, which restricted his movement significantly, effecting an arrest. *See Hodari D.*, 499 U.S. at 626. Because the officers lacked a warrant or consent to enter, and have not posited a valid justifying exigency, the in-home arrest was unconstitutional as a matter of law. *See Payton*, 445 U.S. at 585–90 (prohibiting warrantless in-home arrests under non-exigent circumstances).[7]

### C. Count VI: False Imprisonment

In reference to Count VI, the officers have argued only that they had probable cause to arrest Hawkins for theft of Bumgarner's keys or disorderly conduct.[8] "Probable cause is

---

[6] It is significant to this discussion that Bowersock has not sought qualified immunity.

[7] On appeal, the officers have not argued that Hawkins's disobedience of their commands inside the home or his alleged resistance after the wrist grab could change the result for Count I.

Having found the officers liable for Count I as a matter of law on the theory that they arrested him in violation of the Fourth Amendment prohibition of non-exigent warrantless in-home arrests, we need not also consider Count I as a false-arrest claim.

[8] The officers relied on Illinois's Local Governmental and Governmental Employees Tort Immunity Act in the district court only with respect to the issue of "excessive use of force," *see* Appellees' Mot. Summ. J., C.D. Ill. CM-ECF, case no. 2:10-CV-2111, doc. 36, at 11–14, and not at all in this Court.

an absolute bar to a claim of false imprisonment." *Poris v. Lake Holiday Prop. Owners Ass'n*, 983 N.E.2d 993, 1007 (Ill. 2013).

The standard for probable cause, in turn, is "fluid" and sensitive to "the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Therefore, it isn't "readily, or even usefully, reduced to a neat set of legal rules." *Id.* Nevertheless, we may explain by way of definition that probable cause is "'a reasonable ground for belief of guilt'" that is "particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949) and citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

"The existence of probable cause … depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). It does not, however, "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972); *see also Spiegel v. Cortese*, 196 F.3d 717, 724 n.1 (7th Cir. 1999) (explaining that officers need not "establish probable cause as to *each and every* element of a crime before they are entitled to make an arrest").

The officers' brief argues probable cause as follows:

Since Mitchell and Bowersock were justified in entering the home to get information about the situation, the facts known to them at the time, coupled with Hawkins's conduct, provided

probable cause to effectuate an arrest for either theft of Sarah's keys or disorderly conduct… . The trial court relied upon ample undisputed facts to determine probable cause existed to arrest Hawkins for disorderly conduct … . More specifically, the information known to Mitchell was that Sarah requested assistance in getting her car keys from Hawkins, and Sarah reported Hawkins had been abusive in the past. This information provided Mitchell with probable cause to believe Sarah needed assistance in retrieving her keys from plaintiff.

(Appellees' Br. 19.)

We think probable cause "to believe Sarah needed assistance in retrieving her keys" isn't the point. Instead, Count VI turns on probable cause *to arrest Hawkins*, either for stealing the keys or disorderly conduct.

The claim of probable cause to arrest for theft fails.

A person commits theft when he or she knowingly:

(1) Obtains or exerts unauthorized control over property of the owner; or
(2) Obtains by deception control over property of the owner; or
(3) Obtains by threat control over property of the owner; …

* * *

and

    (A) Intends to deprive the owner permanently of the use or benefit of the property; or

    (B) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or

    (C) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner of such use or benefit.

720 Ill. Comp. Stat. 5/16-1(a).

The facts known at the time do little to suggest that Hawkins had intention or knowledge of depriving Bumgarner of her keys, even if we assume for the sake of argument that he had control over them. Without any accusation of theft, an intoxicated 9-1-1 caller's mere request for assistance in retrieving her keys from someone else's house, coupled with an allegation of unrelated past abuse by that someone, does not amount to probable cause to arrest for stealing the keys.[9]

Next, we consider the disorderly-conduct theory. "A person commits disorderly conduct when he or she knowingly … [d]oes any act in such unreasonable manner as

---

[9] The district court relied on only these facts, plus Hawkins's unwillingness to answer the police's questions, in supporting its finding of probable cause to arrest for theft. *See Hawkins*, 909 F. Supp. 2d at 1023. The problem with holding Hawkins's unwillingness to answer the officers' questions against him, however, is that the officers had no right to be in his home in the first place.

to alarm or disturb another and to provoke a breach of the peace." 720 Ill. Comp. Stat. 5/26-1(a)(1). A "breach of the peace" is "'a public offense done by violence, or one causing or likely to cause an immediate disturbance of public order.'" *Sroga v. Weiglen*, 649 F.3d 604, 607 (7th Cir. 2011) (quoting Restatement (Second) of Torts § 116 (1965)).

On the facts as given by the officers, they had probable cause to arrest Hawkins for disorderly conduct. To an officer in Mitchell's position, it would have reasonably appeared that Hawkins had been involved in the bustle that scattered the clothes over the yard. Mitchell also testifies that Hawkins shouted toward Bumgarner, who was outside, "I don't have your fucking keys!" At the time and within that vicinity, neighbors were likely trying to sleep. If Mitchell's account is true, then Hawkins behaved "in such unreasonable manner as to alarm or disturb" Bumgarner or his neighbors, and the commotion was a "disturbance of public order."

But Hawkins denies the yelling. He testifies that he was in bed asleep when Mitchell knocked on his door. And as for Hawkins and Bumgarner's earlier argument with each other, we do not think shouting within a private home qualifies without more as "likely to cause an immediate disturbance of public order." *See id.* Thus, on Hawkins's version of the facts, the officers lacked probable cause to arrest him for disorderly conduct. This dispute forecloses summary judgment on Count VI. *See, e.g.*, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("[S]ummary judgment cannot be used to resolve swearing contests between litigants.").

## D. Count III: Arrest in Retaliation for Speech

Hawkins has also alleged that Mitchell and Bowersock arrested him "without probable cause and without a judicial warrant, solely in retaliation for his actions of calling an attorney and for his assertion of his Fourth Amendment right to privacy of his home, in violation of the United States Constitution, First Amendment." (Am. Compl. para. 22.)

Summary-judgment decisions on such claims involve a burden-shifting framework. In the *prima facie* case, the plaintiff must show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation. *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012) and *Greene v. Doruff*, 660 F.3d 975, 977–78 (7th Cir. 2011)).[10]

The district court granted summary judgment on the ground that Hawkins had no constitutional right to consult with an attorney under the circumstances. The opinion explains that "the right to contact counsel would severely hamper the ability of police officers to enforce the law." *Hawkins*, 909 F. Supp. 2d at 1024. This was the officers'

---

[10] If the plaintiff makes the *prima facie* showing, "'the burden shifts to the defendant to show that the harm would have occurred anyway.'" *Thayer*, 705 F.3d at 251–52 (quoting *Doruff*, 660 F.3d at 977). And if the defendant does this, "the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* at 252.

argument below, and they have added nothing to it on appeal.[11]

The argument is contrary to precedent. "The right to … consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition… . [T]he state cannot impede an individual's ability to consult with counsel on legal matters." *Denius v. Dunlap*, 209 F.3d 944, 953–54 (7th Cir. 2000) (citing *Bates v. State Bar of Ariz.*, 433 U.S. 350, 376 n.32 (1977) and *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990)).

We also disagree with the officers' possible suggestion that Hawkins's phone call criminally obstructed them in performing their duties. *See* Appellees' Br. 21–22 ("The actions of Hawkins to avoid questioning by using the phone

---

[11] Aware of *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (finding qualified immunity, on the basis of probable cause, from a claim for arrest in retaliation for First Amendment activity), we note that probable cause is open to factual dispute for the reasons given in discussing Hawkins's false-imprisonment claim. But qualified immunity is not available to the officers as a defense, here or on remand. None of the reasons given by the *Thayer* Court for granting qualified immunity from a claim for arrest in retaliation for First Amendment activity notwithstanding the defendant-officers' failure to argue it on appeal is present. *See Thayer*, 705 F.3d at 252–53; *supra* note 3. That is, Mitchell and Bowersock neglected to raise qualified immunity from *any* cause of action, not only here but also in the district court. And the parties have made no "underlying arguments on appeal addressing … whether probable cause bars First Amendment retaliatory arrest claims." *Thayer*, 705 F.3d at 252. Thus, we cannot say, as the *Thayer* Court could, that the defendants made the plaintiff aware of qualified immunity as an issue so that he had an opportunity to respond. *Cf. id.* Finally, because Mitchell and Bowersock left qualified immunity out of their answer to the amended complaint, there is no reason to let them assert it upon remand.

to have a conversation and repeatedly yelling at the officers certainly obstructed with a police investigation."); 720 Ill. Comp. Stat. 5/31-1(a) (defining resisting or obstructing a peace officer as a misdemeanor); 720 Ill. Comp. Stat. 5/7-7 (prohibiting the use of force to resist an arrest made by a known peace officer "even if … the arrest in fact is unlawful"). For such obstruction, "an act of physical resistance" is required. *People v. Stoudt*, 555 N.E.2d 825, 827 (Ill. App. Ct. 1990) (citing *People v. Pruitt*, 520 N.E.2d 1113, 1115 (Ill. App. Ct. 1988)). Neither arguing, nor refusing to answer police, *see People v. Hilgenberg*, 585 N.E.2d 180, 183 (Ill. App. Ct. 1991) ("Mere refusal to answer a police officer, in the absence of a physical act, may be deemed tantamount to argument which is not a violation of the statute." (citing *People v. Weathington*, 411 N.E.2d 862, 863 (Ill. 1980))), nor *refraining* from taking physical action ordered by police, *Stoudt*, 555 N.E.2d at 827, in itself meets the standard. While "evidence that [a] defendant repeatedly disobeyed [an] arresting officer's order to exit [a] vehicle" has sufficed to sustain a conviction of obstructing a peace officer, *People v. Synnott*, 811 N.E.2d 236, 241 (Ill. App. Ct. 2004), citizens enjoy greater protection within their homes. *See Hilgenberg*, 585 N.E.2d at 185 (considering Fourth Amendment implications for § 31-1(a)).

Hawkins committed no crime by calling a lawyer to help him bring an end to an obstinate and unlawful police presence in his home. His call was protected by the First Amendment, *see Denius*, 209 F.3d at 953–54, and arrest qualifies as a deprivation that is likely to deter First Amendment Activity. Yet we cannot further infer as a matter of law that the attorney phone call was a motivating factor in

the decision to arrest him, so that question must be submitted to a jury.

### E. Counts II, IV, and V:
### Excessive Force and Wilful and Wanton Battery

As noted above, there is no challenge regarding the district court's submission of Counts II, IV, and V to the jury as two claims, one for excessive force and the other for wilful and wanton battery in violation of Illinois law. Counsel have made no distinction between the two claims in their arguments before this Court; we likewise treat them as one.

Hawkins claims reversible error in the district court's instruction to the jury that "[t]he lawfulness of Defendants' entry into [his] home or his arrest [was] not at issue." And he urges that the district court's erroneous summary-judgment rulings prevented him from presenting to the jury his challenges to the police's presence within his house and the making of his warrantless arrest there. Also, under Hawkins's view, the summary-judgment order enabled the following improper arguments by defense counsel in closing:

> When an officer is asking you questions, you don't have the right to pick up a phone and call your attorney. You do not have that right.

> And then [the attorney] gave … some very bad advice… . The bad advice that you don't have to talk to [the police officer], you don't have to cooperate with him, and, in fact, you can tell him to get out of your house, it's not true. It's not accurate.

> A police officer has a right to talk to him at that point. A police officer has a right to be asking him

questions. A police officer has a right to demand that he provide answers to those questions.

Well, he doesn't have to answer the questions. But, if he doesn't answer the questions, he is going to be placed under arrest. If he doesn't cooperate, he is going to be placed under arrest.

\* \* \*

What makes the difference is the officers came in. The officers did their job. Bill Hawkins … mistakenly told them that they had to leave his home. That's all that matters here. That's all you have to believe.

\* \* \*

[D]on't be confused. Officer Mitchell had every right to be inside that house.

(Trial Tr., June 13, 2013, 494:10–495:3, 499:7–12, 500:20–21.)

We review *de novo* whether the challenged jury instruction "fairly and accurately summarized the law." *Clarett v. Roberts*, 657 F.3d 664, 672 (7th Cir. 2011) (citing *United States v. Quintero*, 618 F.3d 746, 753 (7th Cir. 2010)). The trial court's decision to give the particular instruction, however, is reviewed for abuse of discretion, *id.* (citing *United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir. 2010)), and we will reverse "only if the instructions in their entirety so thoroughly misled the jury that they prejudiced" Hawkins. *Id.* (citing *Quintero*, 618 F.3d at 753).

"'Improper remarks during a closing argument warrant reversal of the judgment only if the remarks influenced the jury in such a way that substantial prejudice resulted to the

opposing party.'" *Smith v. Hunt*, 707 F.3d 803, 812 (7th Cir. 2013) (quoting *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 644 (7th Cir. 1995)).

The challenged instruction did fairly and accurately summarize the law, in that it follows logically from this Court's statements that "[f]alse arrest and excessive force are unrelated except in forming a sequence." *Lenard v. Argento*, 808 F.2d 1242, 1246 (7th Cir. 1987), *cited with approval by Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 681 (7th Cir. 2007).

Turning to consider defense counsel's summation, we acknowledge that the jury instruction approved here implies that no arguments concerning the lawfulness of the entry or the mere making of an arrest could be relevant to excessive force or battery. So if the jurors reasoned like lawyers, then they knew from the instruction to disregard the challenged segments of the officers' closing. But to presume jurors to read and analyze as lawyers do would be naïve. *Cf. Maus v. Baker*, 747 F.3d 926, 927–28 (7th Cir. 2014) (recognizing that jury instructions do not always cure prejudice). At the end of trial, an officer of the court argued to the jurors that the alleged fact that Mitchell and Bowersock were "doing their job" and Hawkins's allegedly baseless demand that the officers leave his house were "all that matter[ed]." These propositions, the attorney offered, were "all [jurors] had to believe" to find in the officers' favor. Defense counsel further argued to the jurors that they would have to be "confused" to question Officer Mitchell's right to be in Hawkins's house.

In truth, of course, the jurors would have been confused even to be interested in whether Officer Mitchell had a right

to be in the house,[12] but defense counsel's arguments overwhelmingly misled them and the court did not intervene specifically with regard to those arguments. And while most of the false impressions given by the defense summation were consistent with the law of the case at the time, that is precisely what made it futile for Hawkins to object. *Cf. Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1450 (7th Cir. 1992) (appellant "certainly had reason to believe that it would be pointless to press its theory further, and was permitted to wait for a final decision on all the issues in the case before appealing the interlocutory summary judgment decision"). As a result, defense counsel's quoted arguments created substantial prejudice to Hawkins. Retrial of the excessive-force and wilful-and-wanton-battery claims is necessary to eliminate it.

## IV. Conclusion

We REVERSE the grant of summary judgment on Counts I, III, and VI, as well as the judgment on the jury's verdict on Counts II, IV, and V. As for Count I, Mitchell and Bowersock are each liable to Hawkins as a matter of law for seizing him in violation of the Fourth Amendment. We REMAND to the district court for trial of both liability and damages with respect to Counts II through VI, as well as damages for Count I. For clarity, we note two additional points:

As regards each officer's liability on Count III, there is only one genuine issue of material fact: whether Hawkins's phone call to the attorney was a motivating factor in

---

[12] Only excessive force and wilful-and-wanton battery were before the jury, after all.

arresting Hawkins. Each officer for whom Hawkins's phone call to the attorney was a motivating factor in arresting Hawkins is liable on Count III. Each officer for whom the attorney phone call was not a motivating factor is not liable on Count III.

The liability of both officers on Count VI depends entirely on whether probable cause to arrest Hawkins for disorderly conduct existed. If it did, neither officer is liable on Count VI; if it did not, both are liable on Count VI.